Nelson DOTSON, et al., Plaintiffs,

v.

CITY OF INDIANOLA, MISSISSIPPI, et al., Defendants.

No. GC 80–220–WK–O.

United States District Court, N. D. Mississippi, Greenville Division.

Sept. 2, 1981.

Charles Victor McTeer, Greenville, Miss., Sidney R. Bixler, Washington, D. C., for plaintiffs.

W. Dean Belk, Indianola, Miss., James L. Robertson, Oxford, Miss., for defendants.

## MEMORANDUM OF DECISION

Before CHARLES CLARK, Circuit Judge, KEADY, Chief District Judge, and SENTER, District Judge.

KEADY, Chief District Judge:

On May 13, 1981, this three-judge court determined that the legal boundary lines of the City of Indianola, Mississippi, were, for the purpose of conducting municipal elections, those in force and effect prior to November 1, 1964, until such time as annexations made subsequent to that date were properly precleared in accordance with Section 5 of the Voting Rights Act of 1965 as amended, 42 U.S.C. § 1971 et seq. *Dotson v. City of Indianola,* 514 F.Supp. 397 (N.D. Miss.1981) (three-judge court). It was found that on May 25, 1965, May 4, 1966, September 2, 1966, and July 14, 1967, Indianola had annexed territories which brought into the municipality new eligible voters and which had not been precleared. At the time of our previous hearing, a submission of the annexations was pending in the office of the Attorney General of the United States.

Plaintiffs have now filed motions seeking to hold the defendant city officials in contempt for not complying with our order because of their actions following the determination on June 1, 1981, of the Attorney General or, alternatively, to declare the legal boundaries and establish election procedures of the municipality for the holding of the primary election scheduled on Novem-

ber 10, 1981 and the general election on December 8, 1981. On August 7, District Judge William C. Keady, to whom the three-judge panel had remanded the case for further disposition, determined that the issues raised by plaintiffs' present motions should be submitted to the three-judge court for decision in view of the Section 5 claims inherent in or closely connected to the motions. On August 15, the defendants countered by moving for an order to postpone the 1981 municipal elections or to declare temporary election boundaries as proposed by them. The three-judge court having ancillary jurisdiction to rule upon defendants' motions in conjunction with the relief sought by plaintiff, see, *Weintraub v. Hanrahan,* 435 F.2d 461, 463 (7 Cir. 1970), we proceed to adjudicate all issues. For reasons which follow, the court determines that plaintiffs' motion to establish legal boundaries and procedures for the conduct of Indianola's 1981 municipal elections should be sustained, and that defendants not be held in contempt; moreover, that defendants' alternative motion be denied in both aspects. To alleviate any further misunderstandings concerning city elections, the order accompanying this memorandum shall clearly set forth the territorial boundaries and procedures for the conduct of the 1981 municipal elections of mayor and aldermen, as well as the special duties governing Indianola officials.

On August 19, Judge Keady conducted an evidentiary hearing at which the parties appeared with counsel and offered various documents, affidavits, and live testimony, which has been transcribed and submitted to us, along with legal memoranda. Pursuant to Rule 52(a), F.R.Civ.P., we find from the evidence adduced as follows:

## FACTS

(a) *Sequence of Events*

On October 2, 1975, J. Stanley Pottinger, Assistant United States Attorney General for the Civil Rights Division, wrote to Frank Crosthwait, then City Attorney of Indianola. Pottinger informed Crosthwait

that the Department of Justice had been notified that the City had made several annexations to its city limits since November 1, 1964, and that Section 5 of the Voting Rights Act required that such annexations either be submitted to the Attorney General for review or be the subject of a declaratory judgment action in the United States District Court for the District of Columbia before implementation. On November 10, 1975, Crosthwait responded to the Pottinger letter and acknowledged annexations of May 4, 1966, September 2, 1966, and July 14, 1967, but did not mention the May 25, 1965 annexation. Although Pottinger requested him to supply the information required by 28 CFR § 51.1 *et seq.*, Crosthwait merely cited the location of the minute entries in the state court records and noted that he would "obtain the voting changes, if any, for [Pottinger's] review." On December 23, 1975, Pottinger again requested from Crosthwait certain information concerning the disclosed 1966–67 annexations. The City did not respond to this request.

On August 21, 1980, the Department of Justice wrote to Dean Belk, present City Attorney, and noted that no response had been received to its December 1975 request for information. The Department also notified Belk that it had learned of the May 1965 annexation, and again informed the City that all annexations were legally unenforceable until preclearance was obtained and cited the applicable regulations regarding submission of voting changes. Belk was requested to inform the Department of the City's intentions regarding preclearance within twenty days of receipt of the letter.[1]

By letter dated March 6, 1981, Mayor Philip Fratesi provided the information which the Department first requested in Pottinger's December 23, 1975, communication. Pertinent information for each annexation was set forth. James L. Robertson, special counsel for Indianola, stated by affidavit that he and Belk on March 11 met with Department of Justice officials at Washington, D. C. Robertson stated that during the meeting, he asked Barry Weinberg, Chief of the Section 5 Unit, whether all annexations would be treated as a package. According to Robertson, Weinberg "made a response to the clear effect that he saw no reason why they shouldn't all be treated as a package and that in fact it seemed only sensible to so treat these annexations." As a follow-up to that conversation, Robertson on March 17 wrote Weinberg stating:

> [W]e want to be sure it is clear that the City of Indianola is submitting the four annexations between 1965 and 1967 for preclearance as a unit. We think this is consistent with the tenor of the comments from you and other persons present. We do not seek pre-clearance of any of the four annexations individually. We seek pre-clearance of all four as a package, or none at all. In the event that your office declines preclearance of any one or more of the annexations, the other requests for pre-clearance are automatically withdrawn.[2]

The mayor and aldermen at no time adopted a resolution or placed an order on the official minutes declaring the conditions or terms of the submission. Some of the defendant officials, however, were made aware of Robertson's position at this stage of the proceedings and interposed no objection; other aldermen had no knowledge that the submission was being conditionally made. In his affidavit, Robertson candidly acknowledged that he was solely responsible for the "package preclearance submission" and that his decision to submit the annexations as a package was based on three reasons: (1) since so much time had elapsed since the annexations, it seemed the only sensible way to submit the changes;

---

1. The present action was commenced on October 1, 1980.

2. The court was not advised of the contents of this letter until the receipt of Robertson's letter of June 5, 1981. Hence, Indianola's representation to the three-judge panel that it had submitted the annexations to the Attorney General for preclearance failed to state that the City was proposing to withdraw the request for preclearance if any one or more of the annexations were objected to by the Attorney General.

(2) he wanted to assure that preclearance of any future annexations would be judged by viewing the racial population breakdown as it existed in 1964; and (3) he foresaw that "in spite of the fact that doing such would offend the sensibilities of any person having a sense of justice, someone might later try to 'approve' the 1966 and 1967 annexations, while rejecting the 1965 annexation."

Indianola's submission was not actually completed until May 1, when the City provided additional requested information.

On June 1, James P. Turner, Acting Assistant Attorney General, Civil Rights Division, informed Belk that "[t]he Attorney General does not interpose any objections" to the May 4, 1966, September 2, 1966, and July 14, 1967, annexations. The Department did, however, interpose an objection to the 1965 annexation since the white population added to the City at that time diluted then black voting strength by 3.8%. Looking at present voting populations, the Department noted that the "1,991 whites now residing in those annexed areas have caused a present dilution of 16.1 percent in the 1965 pre-annexation city and even when the post 1965 annexations of 1966 and 1967 are included within the city the present effects of the 1965 annexation amount to a 10.7 percent dilution of the black population." Turner's letter stated:

> In limiting our objection to the 1965 annexation, we are not unmindful of the city's request that we preclear none of the annexations here under submission unless we preclear them all. However, the Attorney General's responsibility and authority under Section 5 is to object to those voting changes which are not shown to be nondiscriminatory in purpose or effect. Since our analysis here has found that showing lacking only with respect to the 1965 annexation, that is the only annexation concerning which we have authority to object.

Turner concluded by stating that unless and until Indianola received either a withdrawal of the Attorney General's objection or a favorable declaratory judgment in the District of Columbia court, the 1965 annexation was legally unenforceable insofar as it affects voting.

On June 5, Robertson wrote Judge Keady, with advice to opposing counsel, that "[t]he four 1965–1967 annexations were submitted to the Department of Justice for preclearance *as a package*" (emphasis in original). Quoting his March 17 letter to Weinberg, Robertson noted that prior to the June 1 letter from the Department, "no one with USDJ had interposed any objection to the all-or-none basis on which the annexations were submitted. That municipalities have the power to amend or withdraw Section 5 submissions is almost too obvious to require a statement." The letter concluded by summarizing the City's position.

> [C]ounsel for Indianola understand their present posture to be this: By the Order of May 13, 1981, the City is enjoined from allowing anyone residing in the 1965–67 annexed areas to vote until such time as those annexations have been precleared. USDJ's letter of June 2, [sic] 1981 triggered an automatic withdrawal of all submissions. Therefore, none have been pre-cleared. Until such time as either (a) the Court's Order of May 13, 1981 may be modified or (b) the United States Department of Justice preclears something Indianola submits, the City understands that the residents of the four annexed areas have no right to vote.

On June 11, Robertson wrote Turner, noting that the Department's objection to only the 1965 annexation was "in spite of [Department's] awareness of the fact that Indianola had submitted all four annexations for preclearance as a package, i. e., that, even though the four annexations had been accomplished on four separate dates, because so much time had passed, the only sensible and realistic approach was to treat all as a single annexation." Robertson continued as follows:

> [U]ntil receipt of your June 1, 1981 letter, we had no information that your office in any way took exception to the all-or-none basis of this submission, which I outlined in clear and unmistakable language in my

March 17 letter. And, in fact, we do not read your June 1 letter to take exception to the packaged basis of our submission. We understand you to be stating that you have responsibility and authority under Section 5 only to object to voting changes which are not shown to be nondiscriminatory in purpose or effect and that, in your view, the 1965 authority [sic] is the only one of the four concerning which you have authority to object. We assume you now agree that, by virtue of that objection having been made, in accordance with the clear language of my letter of March 17, 1981, your failure to preclear the May 1965 annexation worked an automatic withdrawal of the request for preclearance on all four of the 1965–1967 annexations. Hence, none have been precleared.... [T]he City understands that at this time no one residing in the areas annexed between 1965 and 1967 may lawfully be allowed to vote in city elections. This will remain the situation until Indianola makes a new submission and obtains preclearance.

... [W]e have no intention of leaving the matter in its present state. To do so would be irresponsible, inconsistent with the spirit and purpose of the Voting Rights Act, and contrary to the best interest of the City of Indianola. It is our intention to devise a plan for the enlargement of the boundaries of the city beyond those existing November 1, 1964 which you will find yourselves able to approve consistent with your obligation under Section 5. Mindfull [sic] of the fact that the elections are scheduled this fall, we expect to move with some dispatch in this matter.

On August 6 the Department responded in part as follows:

3. That provision provides:
   If while a submission is pending the submitted change is repealed, altered, or declared invalid or otherwise becomes unenforceable, the jurisdiction may withdraw the submission. In other circumstances, a jurisdiction may withdraw a submission only if it shows good cause for such withdrawal.

We were aware of the city's request that the four annexations be considered as a package and that an objection to any one of the four be considered a withdrawal of the Section 5 submission of the other three annexations. However, as explained in our letter of June 1, 1981, the Attorney General has a responsibility to object only to those changes which have a discriminatory purpose or effect. In addition, Section 51.23 of the Procedures for the Administration of Section 5 of the Voting Rights Act of 1965, as amended,[3] provides for the withdrawal of a submission only under certain circumstances which in this instance have not been met. Thus, all of the submitted voting changes were subjected to Section 5 review and the voting changes occasioned by the 1966 and 1967 annexations were found to satisfy the Section 5 test.

On August 10, the mayor and board of aldermen adopted an annexation ordinance requesting the Chancery Court of Sunflower County to approve an annexation of territory adjoining the southern segment of the present corporate limits, consisting of residential areas inhabited solely by blacks. A hearing on the City's petition in chancery court has been scheduled for September 18. If approved, the City proposes to submit the annexations to the Department for preclearance, apparently once more as a package.[4]

(b) *Statistical Effect of the Annexations*

In the absence of official census data reflecting Indianola's racial composition on November 1, 1964, we must assume that the population did not change from 1960, when, according to government census data, the City had a total population of 6,714. Whites were then in the minority with 2,950 (43.9%), while the City had a nonwhite pop-

46 Fed.Reg. 875 (1981) (to be codified in 28 CFR § 51.23).

4. Counsel for plaintiffs advise the court that they propose to contest the chancery court petition. Presumably, they will also challenge further preclearance submissions to the Civil Rights Division.

ulation of 3,764 (56.0%). By the time of the 1980 official census, only 4,826 persons resided within the corporate boundaries as existed on November 1, 1964, although the racial composition of this "inner-city" was approximately the same in 1980 as it was in 1964—there were 2,146 whites (44.5%) and 2,680 nonwhites (55.5%).

By 1980 census figures, the May 15, 1965 annexation added 1,901 whites and no nonwhites. The later annexations added 1,323 nonwhites and no whites.[5] Thus, if only those persons residing within the "inner-city" plus the areas included within the 1966 and 1967 annexations are considered, the population for voting purposes would be 6,149 persons, of whom 2,146 are whites (34.9%) and 4,003 are nonwhites (65.1%), which would result in a 9.1% increase in nonwhites since November 1, 1964. However, if the 1965 annexation objected to by the Civil Rights Division were also considered, 1,901 whites thereby added would increase the percentage of white population to 50.3% and reduce the nonwhite population to 49.7%.[6]

By its August 10 resolution, Indianola presently seeks to make an additional annexation to add 1,391 nonwhites. Added to the population of the "inner-city" and the populations contained in the 1965 and 1967 annexations, the city population would then be 9,441, consisting of 4,047 whites (42.9%) and 5,394 nonwhites (57.1%). Thus, the City proposes to restore the racial composition of the City to substantially what it was on November 1, 1964. The City took this remedial action as soon as the 1980 census population maps became available.

### (c) *Testimony of City Officials*

At the August hearing, Mayor Fratesi and the five aldermen, Charlotte Buchanan,

Gary Austin, Harold Manning, Clarke Johnson and James Robinson, submitted affidavits and were cross-examined. The affidavits of attorneys Belk and Robertson were also received. In their affidavits, each of the city officials stated that he or she had no intention to violate our May order and that the City's actions were taken in good faith with the intention of making the franchise available to all who had previously voted in city elections and in an effort to present the Department with annexations that were of nondiscriminatory effect.

On cross-examination, Mayor Fratesi stated that he did not know the reason for the delay from August 1980 until March 1981 in submitting the annexations to the Attorney General since the City had left the matter up to its attorneys. The City initially intended that persons residing in annexations approved by the Attorney General would be allowed to vote, but it was subsequently decided that the black persons residing in the 1966 and 1967 annexations would not be allowed to vote since the Attorney General objected to the 1965 annexation. Tr. 85–86.

Buchanan, who resides in the area annexed in 1965, stated that she understood from the Attorney General's June 1 letter that all persons, except those residing in the 1965 annexation would be allowed to vote, but that the city attorneys did not agree with her interpretation. Tr. 102. Austin also resides in the 1965 annexed area. He stated that it "has always been [his] understanding" that persons residing in area "that were approved by the Justice Department . . . would be allowed to vote, period." Tr. 114. Austin did not affirm Robertson's statement of the City's position in his June 5 and June 11 letters. Tr. 117–18.

---

**5.** The City's demographic expert conceded that a small number of whites were actually added by the 1967 annexation. Although he included these whites as part of the 1965 annexation, Professor Williams maintained that his figures reflecting the total number of blacks and whites added to the City from 1965 to 1967 are correct.

**6.** In its objection letter, the Department of Justice stated that, according to 1980 census data,

1991 whites resided within the area annexed in 1965 and that, even considering the 1966 and 1967 annexations, the addition of this number of whites resulted in a 10.7% present dilution of black voting strength, while the figures provided by Prof. Williams indicate only a 6.3% dilution since 1964. Although these inconsistencies are unexplained, we deem them largely irrelevant.

Manning, also a resident of the 1965 annexation, testified that the city attorneys did not advise the board that persons residing in the areas annexed in 1966 and 1967 should not be allowed to vote. Tr. 124. Johnson took a somewhat different position, agreeing that persons residing in the areas annexed in 1966 and 1967 should not be allowed to vote because "it would be just as detrimental to the white voters as it would be for those black voters that would be disenfranchised. [Johnson] wanted to work up a package that would be satisfactory to everybody and give everybody a fair and honest vote." Tr. 137.

Robinson, the only black alderman, resides in one of the areas annexed in 1966 or 1967. Robinson understood "that once the Justice Department preclears any subdivision, that that particular city has no power to overrule the Justice Department." Tr. 144. Robinson, who first heard that the submission was on a package basis "after the Justice Department had made its ruling," characterized the package submission as follows:

> The package theory, to my mind, was just a defense by our legal group and had no bearing on what the Justice Department decided . . . . It was out of our hands. In my considered opinion, it was out of our hands the minute it got to the Justice Department.

Tr. 145.

None of the aldermen could recall a vote by them authorizing the annexations to be submitted as a package, although most acknowledged that the city attorneys were authorized to speak for the board.

Indianola's regularly scheduled quadrennial general elections for mayor and aldermen are to occur on December 8, 1981, and the primary election thirty days before, on November 10. Electors and candidates for office must qualify by October 9. Preparatory to holding the elections, election officials must purge the registration rolls and take other steps necessary to hold an orderly election. W. E. Felts, Assistant Clerk of the City of Indianola, stated in his affidavit that the City presently has over 6,000 names on its roll of registered voters and that, in order to properly purge the roll, the election commissioners could review no more than 500 names per day. On cross-examination, however, Felts acknowledged that the voter rolls are purged prior to every quadrenniel election, and that, in his experience, the process has never taken more than four or five days.

Because of the publicity attendant upon the positions taken by the parties and the hearings in court, Indianola citizens who reside in affected annexed areas are uncertain as to their status as voters and possible candidates in the fall elections.

## LEGAL ANALYSIS

If this court had plenary jurisdiction to consider this matter, we would first ask "what was submitted to the Attorney General?" If it were determined that the submission was effectuated by the March 6 letter from Mayor Fratesi which was not conditioned in any way and that Robertson, as the City's special counsel, could not thereafter restrict the Attorney General's review, the inquiry need proceed no further, since under those circumstances the Attorney General would clearly have authority to preclear only those annexations he deemed to be nondiscriminatory. If, however, it were determined that the initial submission was validly amended[7] by Robertson's March 11 letter which conditioned preclearance on an "all or nothing" basis, we would then have to ask whether the Attorney General was justified in limiting his objection to the 1965 annexation.

It is, of course, well established that this local district court does not have unlimited jurisdiction in § 5 issues. *See Allen v. Board of Elections*, 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969). Because we conclude that the Attorney General's actions in this case are insulated from judicial review, we may assume that the City's submission

---

**7.** The regulations recognize that a submission may be supplemented by the political unit. *See* 46 Fed.Reg. at 878 (1981) (to be codified in 28 CFR § 51.37).

was validly amended to provide that all annexations were being submitted as a package.

Preclearance through the Attorney General was proposed and adopted as an expeditious alternative to declaratory judgment actions in the United States District Court for the District of Columbia. Hearings on S.1564 before the Senate Committee on the Judiciary, 89th Cong., 1st Sess., pt. 1, at 237 (1965); *see Harper v. Levi*, 520 F.2d 53, 65 (D.C.Cir.1975). Recognizing that this objective would be frustrated if the Attorney General's action could be reviewed at the instance of an aggrieved party, the Supreme Court held in *Morris v. Gressette*, 432 U.S. 491, 97 S.Ct. 2411, 53 L.Ed.2d 506 (1977), that the Attorney General's failure to interpose an objection to voting changes within 60 days of the completed submission was not reviewable.

*Morris* involved a challenge to South Carolina's reapportionment statute. The state had submitted the statute to the Attorney General, who timely interposed an objection. Subsequently, the United States District Court for the District of South Carolina held that the statute violated the fifteenth amendment and allowed the state 30 days to enact a constitutionally acceptable reapportionment plan. The new plan was filed with the district court and the Attorney General. Since the district court upheld the new plan's constitutionality, the Attorney General notified the state that it felt constrained to defer to that court's determination and accordingly would not interpose an objection. *Id.* at 493–97, 97 S.Ct. at 2414–17, 53 L.Ed.2d at 512–14.

Plaintiffs then commenced suit in the United States District Court for the District of Columbia, which ordered the Attorney General to make "a reasoned decision in accordance with his statutory responsibility." *Harper v. Kleindienst*, 362 F.Supp. 742, 746 (D.D.C.1973). The Attorney General responded by stating that while he felt the new plan had constitutional infirmities, he nonetheless felt constrained to abide by the South Carolina court's ruling. After being directed to ignore the South Carolina court's decision, the Attorney General interposed an objection. The objection came more than 60 days after the state submitted the new plan to the Attorney General. The D. C. Court of Appeals affirmed, holding that the Attorney General's action in failing to make an independent determination of § 5 issues was reviewable. *Harper v. Levi, supra.*

Plaintiffs then filed an independent suit in the South Carolina District Court seeking injunctive relief against implementation of the new reapportionment plan. The three-judge court in South Carolina refused to follow *Harper v. Levi*, and held that the Attorney General's actions were not reviewable. *Morris v. Gressette*, 425 F.Supp. 331, 337 (D.S.C.1976).

On appeal the Supreme Court affirmed and held that the Attorney General's determinations under § 5 are not reviewable under the Administrative Procedures Act since "Congress did not intend the Attorney General's actions under that provision to be subject to judicial review." 432 U.S. at 501, 97 S.Ct. at 2419, 53 L.Ed.2d at 517. The Court noted:

> In light of the potential severity of the § 5 remedy, the statutory language, and the legislative history, we think it clear that Congress intended to provide covered jurisdictions with an expeditious alternative to declaratory judgment actions. The congressional intent is plain: The extraordinary remedy of postponing the implementation of the validly enacted state legislation was to come to an end when the Attorney General failed to interpose a timely objection based on a complete submission. Although there was to be no bar to subsequent constitutional challenges to the implemented legislation, there also was to be "no dragging out" of the extraordinary federal remedy beyond the period specified in the statute. Since judicial review of the Attorney General's actions would unavoidably extend this period, it is necessarily precluded.

*Id.* at 504–05, 97 S.Ct. at 2420, 53 L.Ed.2d at 518–19 (footnotes and citations omitted).

The Court's conclusion concerning nonreviewability was reinforced by the fact that neither the Attorney General's objection or failure to object is conclusive with respect to the validity *vel non* of the voting change. 432 U.S. at 505 & n.21, 97 S.Ct. at 2420 & n.21, 53 L.Ed.2d at 519 & n.21. Finally, the Court noted that courts must operate "on the assumption that the Attorney General of the United States will perform faithfully his statutory responsibilities." 432 U.S. at 506 n.23, 97 S.Ct. at 2421 n.23, 53 L.Ed.2d at 520 n.23. In response to the United States' argument that judicial review should be allowed whenever "the Attorney General improperly relinquishes his responsibility to evaluate independently the submitted legislation in light of the standards established by § 5," the Court stated that "Congress intended to preclude all judicial review of the Attorney General's exercise of discretion or failure to act." *Id.* at 507 n.24, 97 S.Ct. at 2421 n.24, 53 L.Ed.2d at 520 n.24.[8]

*Morris* has been relied upon by the lower courts as precluding judicial review of the Attorney General's actions in a variety of factual circumstances. In *Harris v. Bell*, 562 F.2d 772 (D.C.Cir.1977), plaintiffs contended that the Attorney General's action in withdrawing an objection to a submission violated his own regulations since the withdrawal was not based on "previously unavailable" information as the regulations then required. The district court held that it had authority to review the Attorney General's procedural determination and therefore denied defendant's motion to dismiss. *Harris v. Levi*, 416 F.Supp. 208, 210–11 (D.D.C.1976). On appeal, the D. C. Circuit reversed upon the authority of *Morris* and held that there was "no basis for allowing judicial review of the Attorney General's determination that previously unavailable information justifies withdrawal of an objection, or of his application of the statutory standards in the context of a decision to withdraw." 562 F.2d at 774.

In *City of Rome v. United States*, 450 F.Supp. 378 (D.D.C.1978), *aff'd on other grounds*, 446 U.S. 156, 100 S.Ct. 1548, 64 L.Ed.2d 119 (1980), the city filed suit alleging, *inter alia*, that the Attorney General's objection in the absence of a hearing or written findings violated its due process and other constitutional rights. The court dismissed the city's claim, holding that it was without jurisdiction to review the procedures used by the Attorney General in deciding to interpose an objection and that "[i]t is of no consequence in assessing ... jurisdiction ... whether the challenge is couched in terms of improper procedures or in terms of improper result." 450 F.Supp. at 381 & n.2. Responding to plaintiff's argument that judicial review of allegedly unconstitutional executive action is required under the doctrine of judicial supremacy, the *Rome* court recognized that "Congress has neither totally insulated the Attorney General's actions from judicial scrutiny nor totally deprived plaintiffs of judicial redress. Congress merely has established *an exclusive means* of obtaining 'review' of the Attorney General's determination—a de novo proceeding in the District Court for the District of Columbia." *Id.* at 382 n.3 (emphasis in original).

■ In the case sub judice, Indianola argues that the Attorney General was without authority to preclear the 1966 and 1967 annexations while objecting to the 1965 annexation. The City's reasoning is that it submitted all annexations as a single change affecting voting. By not adhering to the City's "package consideration" condition, the City maintains that the Attorney General failed to preclear that which was submitted. The City concludes by stating that there is nothing "in the statute or regulations which permits the Justice Department to ... preclear[ ] part of an an-

---

8. The majority's result was over the dissent of Justice Marshall who stated:

> [I]t matters not whether the Attorney General fails to object because he misunderstands his legal duty ...; because he loses the submission; or because he seeks to subvert the

Voting Rights Act. Indeed, the Court today grants unreviewable discretion to a future Attorney General to bargain acquiescence in a discriminatory change in a State's voting laws in return for that State's electoral votes. *Id.* at 508, 97 S.Ct. at 2422, 53 L.Ed.2d at 521.

nexation while rejecting other parts." Defendant's Opposition to Motion for Contempt Citation at 22. Under the authorities discussed above, however, there can be no judicial review of the Attorney General's action in preclearing three annexations while objecting to one. Indianola invoked the Attorney General's discretion by pursuing the administrative rather than judicial alternative to preclearance. Since "Congress intended to preclude all judicial review of the Attorney General's exercise of discretion" under § 5,[9] the City's sole remedy at this juncture is to institute suit in the D. C. court for a declaratory judgment that the 1965 annexation has neither a discriminatory purpose or effect. We are, in short, without jurisdiction to question the Attorney General's authority in limiting his objection to the 1965 annexation.[10]

▮ Accordingly, the Attorney General's June 1 letter must be taken at face value. As such, it has the effect of precluding from voting or running for office only those electors residing in the May 1965 annexation. Electors residing in the areas annexed in 1966 and 1967 clearly should be allowed to vote. The City maintains that although the Attorney General may have precleared these areas, it is under no obligation to allow electors residing therein to vote, and that it may lawfully revert to the November 1, 1964, city boundaries for voting purposes. This argument must fail for two reasons. First, such action, if taken by the City, would amount to purposeful discrimination on the basis of race and therefore would violate the federal constitution. Indianola may not, in effect, de-annex black persons solely because it does not desire to provide the rights entitled to all citizens of a municipality. *See Franklin v. City of Marks*, 439 F.2d 665, 670 (5 Cir. 1971). Furthermore, action of such character would itself amount to a voting change since citizens residing in the 1966 and 1967 annexed areas have voted for the past 15 years. Since there no longer exists a federal obstacle to their exercise of the franchise, § 5 would require federal preclearance before Indianola might lawfully take the position that citizens residing in 1966 and 1967 annexations may no longer be allowed to vote. In rejecting Indianola's assertion that it is free to restrict the electoral base as it may desire, we note the Fifth Circuit's holding in *City of Marks, supra*, that "[w]hat might be regarded as a routine municipal ordi-

**9.** *Morris v. Gressette, supra*, 432 U.S. at 507 n.24, 97 S.Ct. at 2421 n.24, 53 L.Ed.2d at 520 n.24.

**10.** We do note, however, that the Attorney General's action in objecting to only part of a submission is hardly novel. For example, in *City of Rome v. United States*, 446 U.S. 156, 100 S.Ct. 1548, 64 L.Ed.2d 119 (1980), the city submitted 60 annexations in one submission. The Attorney General approved 47 annexations and objected to 13. On reconsideration, the Attorney General approved the 13 annexations for purposes of school board elections but not for purposes of city commission elections. *Id.* at 161–62, 100 S.Ct. at 1554, 64 L.Ed.2d at 130. The D. C. court, in a de novo declaratory judgment proceeding, reached the same result, which the Supreme Court affirmed. *Id.* at 187, 100 S.Ct. at 1567, 54 L.Ed.2d at 146.

*Woods v. Hamilton*, 473 F.Supp. 641 (D.S.C. 1979) suggests that the Attorney General had the duty to pass on all of the annexations submitted on March 6. There South Carolina submitted for preclearance an act which had three components. On the 60th day after the completed submission was received, the Attorney General responded as follows: (1) he expressly did not object to one component; (2) he attempted to reserve the right to object to another component; and (3) he did not mention the third component. *Id.* at 645. The district court held that all three aspects of the act were precleared since "[t]he statutory scheme makes [the Attorney General's] failure to object to such submission, or to any part thereof, within that [60 day] period tantamount to approval." *Id.* at 645. Since the state submitted the entire act, "the Attorney General was required to pass on all components of a complete submission." *Id.* at 646.

Although the City has apparently dropped its argument that the Attorney General's action in preclearing only three of the annexations operated as an automatic withdrawal of the submission, see Defendant's Opposition to Motion for Contempt Citation at 20–24, such an argument would produce the same result as indicated above. The Attorney General's June 1 letter implicitly rejected the City's position that it could so withdraw a submission and his August 6 letter explicitly stated that the City did not have the right to withdraw its submission. We may not review this decision.

nance or proceeding in state law is therefore subjected to thorough analysis and examination in federal law when the effect of the ordinance or proceeding is to deprive citizens of their federally protected rights." The judgment of this court shall therefore fix the legal boundaries for voting purposes to consist of those boundaries existing on November 1, 1964, plus the areas annexed on May 4, 1966, September 2, 1966, and July 14, 1967.

■ We do not, however, believe that defendants or their counsel should be held in contempt of court. They have not, in fact, violated any order of this court since elections have not yet taken place.

■ Finally, we perceive no good reason for delaying the 1981 elections. It is clear that there remains more than adequate time for the City and prospective candidates to prepare for elections. Stripped of its assertion that there is not adequate time, the City's request to postpone elections is based solely on its desire to preclude its black citizens from obtaining a "windfall" advantage in electing candidates of their choice. This justification clearly runs afoul of constitutional proscription against purposeful discrimination. Also it would be manifestly unjust to all persons legally entitled to vote for us to delay elections in order to give the City another opportunity to seek preclearance of the May 25, 1965, annexation, together with additional territory. Moreover, the present City officials, three of whom reside in the 1965 annexed area, should not be allowed to remain in office beyond the expiration of their present term for an indefinite period awaiting the outcome of what promises to be lengthy contests in state court and before the Department of Justice.

We therefore conclude that city elections should proceed as scheduled and that only those electors presently residing in the city limits as established on November 1, 1964, and in the areas annexed on May 4, 1966, September 2, 1966, and July 14, 1967, be allowed to vote in the fall 1981 primary and general elections unless the City, before October 9, 1981, shall have additional annexations approved by the Mississippi state courts and precleared pursuant to § 5 of the Voting Rights Act.

Judgment will be issued in accordance with Fed.R.Civ.P. 58.