**Nelson DOTSON, Ruthie Mae Moton, et al., Plaintiffs-Appellants, Cross-Appellees,**

v.

**The CITY OF INDIANOLA, MS., et al., Defendants-Appellees, Cross-Appellants.**

**No. 82–4595.**

United States Court of Appeals, Fifth Circuit.

Aug. 24, 1984.

---

McTeer & Bailey, Charles Victor McTeer, Willie Griffin, Greenville, Miss., Carver Randale, Indianola, Miss., for Dotson, et al.

Clark, Davis & Belk, W. Dean Belk, Indianola, Miss., Freeland & Gafford, James L. Robertson, T.H. Freeland, III, Oxford, Miss., for defendants-appellees, cross-appellants.

Before WISDOM, REAVLEY, and HIGGINBOTHAM, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

We face cross-appeals over the issue of whether the city of Indianola has been motivated by a discriminatory purpose in its annexation attempts. We are persuaded that the conclusions of the district court regarding purposeful discrimination drawn from facts found to be undisputed are not adequate for our review and may be internally inconsistent and inappropriate for summary judgment when viewed against the permissible use of race to remedy voting act violations. We remand for trial of any genuine issues of material fact.[1]

I

On four separate occasions from 1965 to 1967 Indianola annexed adjacent areas; the 1965 annexation contained whites only and the other annexations contained only non-whites. Despite requests from the Justice Department, Indianola did not submit the annexations for preclearance, and the people in the annexed areas voted in the municipal elections of 1968, 1969, 1973, and 1977. In 1980, Nelson Dotson and other black citizens of Sunflower County, Missis-

---

1. Plaintiffs also appeal from the denial of an award of costs for prosecution of this suit since October 13, 1981. Since on remand the outcome of the case may change, the issue of costs, including attorney's fees, will be open on remand. Furthermore, although plaintiffs focused on the issue of discriminatory purpose, they also alleged a violation of the "results" test under section two of the Voting Rights Act. On

this record we are unable to make our own determination under the section 2 standard, and it does not appear that the trial court made a determination on this issue. Therefore this issue also remains open on remand. Finally, since on remand the district court may find no discrimination, we decline to reach the issue of whether the district court's injunction was proper.

sippi brought this suit. Count I of their complaint challenged the annexations for lack of preclearance. Counts II through V alleged that Indianola's annexation policy, resulting in a failure to annex black neighborhoods · surrounding Indianola, violated the Voting Rights Act and the Thirteenth, Fourteenth, and Fifteenth Amendments to the United States Constitution. In connection with Counts II through V, plaintiffs asked the court to order annexation of the surrounding black neighborhoods. The preclearance issue was decided by a three-judge court, which ordered that the people in the annexed areas not be allowed to vote in future elections unless the annexations were precleared. *Dotson v. City of Indianola,* 514 F.Supp. 397 (N.D.Miss.1981), *aff'd,* 455 U.S. 936, 102 S.Ct. 1424, 71 L.Ed.2d 646 (1982). At the time of the ruling, a submission of the annexations was before the Attorney General.

In making its submission to the Attorney General, the city insisted that the four annexations be considered as a package. The Justice Department, however, approved all but the 1965 annexation, finding that even with the additional blacks added by the post-1965 annexations, the addition of the 1,991 whites living in the 1965 area would dilute black voting strength in comparison to the city's pre-annexation population. In its letter informing the city of the objection to the 1965 annexation, the Justice Department left open the possibility that the 1965 annexation would be approved under certain conditions:

[S]hould the city adopt an electoral system such as, for example, a fairly drawn single-member district plan, that would afford black voters a realistic opportunity to elect candidates of their choice, the Attorney General would withdraw the objection. Another alternative might be to offset the dilutive effect of the annexation in question by annexing the black residential areas adjacent to the city.

The city disputed the Justice Department's power to treat the four annexations separately. When the city made clear that none of the people in the four annexations would be allowed to vote in the next municipal election, plaintiffs requested the three-judge court to hold Indianola's city officials in contempt for not complying with the original order. In the process of deciding this question, the three-judge court noted that Indianola had begun proceedings in Mississippi Chancery Court to gain approval of a new annexation of an almost completely non-white area. The court characterized the annexation as a "remedial" action by which the city proposed "to restore the racial composition of the city to substantially what it was on November 1, 1964." *Dotson v. City of Indianola,* 521 F.Supp. 934, 939 (N.D.Miss.1981), *aff'd,* 456 U.S. 1002, 102 S.Ct. 2287, 73 L.Ed.2d 1296 (1982). The three-judge court ordered that people in the precleared post-1965 annexations, and people in the city as it existed before 1965, be allowed to vote in municipal elections, and left the door open for any subsequently precleared annexations. *Id.* at 944.

## II

Cross-motions for summary judgment on the remaining "failure-to-annex" counts were left to the district judge, the three-judge court issues having been decided. The district judge rendered the decision now before us. *Dotson v. City of Indianola,* 551 F.Supp. 515 (N.D.Miss.1982) (*Dotson III*). After that decision, the Justice Department denied preclearance of a new submission by the city of both the 1965 annexation and the new, 1983 annexation. Basing its decision in part upon *Dotson III,* the Justice Department concluded that the annexations were "based on the unconstitutional purpose of excluding adjacent areas for reasons of race." [2]

2. In the usual case involving simply an attempt to block a proposed annexation, the district court ought not decide constitutional issues without waiting to see if the proposed annexation would obtain § 5 clearance by either the Justice Department or the district court for the District of Columbia. *See Wise v. Lipscomb,* 437 U.S. 535, 542, 98 S.Ct. 2493, 2498, 57 L.Ed.2d 411 (1978); *Connor v. Waller,* 421 U.S. 656, 95 S.Ct. 2003, 44 L.Ed.2d 486 (1975). Here the

From our reading of the record we are unable to determine as a matter of law whether Indianola's annexation plans, resulting in a refusal to annex black subdivisions, have been or are to any extent motivated by a discriminatory purpose. The district court distinguished among black residents in Indianola, the 1983 annexation area, and Southgate,[3] dividing these groups into classes A, B, and C. The district court determined that there was no discrimination as to classes A and B, concluding as regards class B that the city's use of race in the 1983 annexation was in an effort to comply with the Voting Rights Act. Yet, relying heavily on the mayor's affidavit in which he admitted the explicit use of race as a consideration, the district court concluded that there was discrimination as to class C. *See Dotson* III, 551 F.Supp. at 517–18, 519.

This distinction among classes is not a workable framework for analyzing Indianola's purpose because an underlying, non-remedial purpose of achieving a certain racial balance in Indianola in order to prevent dilution of the white vote would affect all three classes. This follows because the purpose would be to prevent the three classes of blacks from combining to vote, thereby diluting the white vote. We need not then address the city's contention that, because Southgate residents are not within the city's jurisdictional limits, they cannot assert a claim of discrimination relating to the city's refusal to annex them, and that for this reason the district court's conclusion of discrimination as to class C must fall.

Further, it appears that the district court understood Mayor Fratesi's affidavit—the basis for the conclusion that there was discrimination against class C—as expressing an underlying discriminatory policy in annexations. The court's reading of Mayor Fratesi's affidavit has two problems. First, although this reading is supportable, our own review of the affidavit suggests another plausible reading—that Mayor Fratesi was admitting only that race was a consideration in fashioning the 1983 annexation. The 1983 annexation may be characterized as remedial, thereby allowing the city explicitly to use race in fashioning the annexation. *See United Jewish Organizations v. Carey*, 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977). In fashioning a remedial plan, the balancing process may include consideration of not only the interests of the minority, but also the interests of innocent whites. *See Fullilove v. Klutznick*, 448 U.S. 448, 484, 100 S.Ct. 2758, 2777, 65 L.Ed.2d 902 (Opinion of Burger, C.J.); *id.* at 514, 515 n. 13, 100 S.Ct. at 2793 n. 13 (Powell, J., concurring); *id.* at 530 n. 12, 100 S.Ct. at 2801 n. 12 (Stewart, J., dissenting).[4] *Cf. Ford Motor Co. v. EEOC,*

Justice Department had precleared annexations that plaintiffs allege were part of an overall purposefully discriminatory annexation policy, and blocking any of the proposed annexations would not have given plaintiffs relief.

3. We use "Southgate" to refer generically to the various subdivisions that the plaintiffs say should have been annexed.

4. In *Fullilove*, only Justices Powell's and Stewart's opinions directly address the issue of whether the interests of innocent parties may be taken into account in fashioning a remedial plan. Notwithstanding, Chief Justice Burger's point that when a remedial plan is "limited and properly tailored" it is not per se constitutionally defective because it burdens innocent parties, and his further statement explicitly noting that the actual burden shouldered by innocent parties in the particular program under consideration was "relatively light," impliedly support the idea that the interests of innocent parties may be considered when creating a "limited and properly tailored" remedial plan. The first statement implies that the interests of innocent parties are relevant in considering whether a remedial plan is "limited and properly tailored," and the explicit consideration of the degree of severity of the burden shouldered by innocent parties because of the program in question in *Fullilove* indicates the legitimacy of such a consideration.

While *UJO* did not directly involve the issue of whether to allow the consideration of the interests of innocent parties, it is helpful to consider the issue under the circumstances of that case. We say no more here than that once it became permissible to enhance black voting strength to obtain the Attorney General's approval of the redistricting plan in *UJO*, it would have also been permissible for the New York legislature to consider the degree to which the redistricting plan diluted white voting strength in deciding

458 U.S. 219, 239–40, 102 S.Ct. 3057, 3069–70, 73 L.Ed.2d 721 (1982); *Teamsters v. United States*, 431 U.S. 324, 371–76, 97 S.Ct. 1843, 1872–75, 52 L.Ed.2d 396 (1977). Therefore, if the mayor's statements avowing the explicit use of race are no more than an expression of Indianola's effort to comply with section five of the Voting Rights Act, the affidavit would evidence no "discriminatory purpose." With these distinctions in mind we are persuaded that the affidavit is too ambiguous to support a summary judgment "finding" of discrimination.[5]

■ The second problem with the district court's apparent reading of Mayor Fratesi's affidavit involves the different conclusions with respect to the different classes. If the court perceives Fratesi to be expressing a general policy of preventing the dilution of white votes, then his conclusions appear to reflect a belief that the 1983 annexation was remedial, and consequently legitimate, but that Indianola's general annexation policy was imbued with the illegitimate purpose of preventing the dilution of white votes. In such a situation in which the city was motivated in part by a racially discriminatory purpose, the 1983 annexation could not be upheld unless the city carried its burden of establishing that the same annexation decision would have resulted had the impermissible purpose not been considered. *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 270 n. 21, 97 S.Ct. 555, 566 n. 21, 50 L.Ed.2d 450 (1977).

In sum, the able district court in concluding this protracted case cut the explanation of its conclusions so thin that we are left uncertain as to their internal consistency and are persuaded that summary judgment was inappropriate. Unable to credit either the district court's conclusions of no discrimination against classes A and B, or the

conclusion of discrimination against class C, we must remand.

The judgment of the district court is vacated and the case is remanded for trial. The district court should make those subsidiary findings which support its conclusion regarding discriminatory purpose mindful that Indianola may not prevail if it was motivated in part by a discriminatory purpose, unless it establishes that the same annexation decision would have resulted had the impermissible purpose not been considered; nor could Indianola have held one purpose discriminatory as to Southgate blacks but not discriminatory as to the other black plaintiffs.

VACATED and REMANDED.

WISDOM, Circuit Judge, concurring in the result.

With deference, I submit this special concurring opinion.

I agree that summary judgment was inappropriate in this case, but my reasons differ from those of my colleagues. The majority opinion states that because the 1983 annexation was an effort to secure preclearance, it "may be characterized as remedial, thereby allowing the city explicitly to use race in fashioning the annexation". As I see it, however, neither *United Jewish Organizations v. Carey*, 1977, 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229, nor *Fullilove v. Klutznick*, 1980, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902, supports the use of a "remedial" plan to justify a discriminatory refusal to annex black citizens because of their race. Applying *UJO* to the facts of the present case turns its doctrine upside down. In *UJO*, a certain Jewish community had been split as part of a state redistricting plan. The split was designed to enhance the voting strength of the state's black population to obtain the Attorney General's approval of the redistricting plan. Members of the Jewish com-

---

where to draw the line in enhancing black voting strength.

**5.** That both parties on cross-motions for summary judgment simultaneously argue that there are no genuine issues of material fact does not

establish the district court's power to decide the case without a trial. *Kirkpatrick v. Seligman & Latz, Inc.*, 636 F.2d 1047 (5th Cir.1981); *Schlytter v. Baker*, 580 F.2d 848, 849 (5th Cir.1978).

munity sued the governor. The district court dismissed their complaint. The Supreme Court affirmed. Even though the redistricting plan diluted the voting strength of the white community, the plan was constitutional because its purpose was not to minimize the voting strength of the whites or to impair their access to the political process. *See* 430 U.S. at 167, 97 S.Ct. at 1010 (opinion of White, J.); *id.* at 179–80, 97 S.Ct. at 1016–17 (Stewart, J., concurring in the judgment).

*UJO* establishes that government may use race explicitly in fashioning a remedial plan *if* the use of race is necessary to the remedy. *UJO*, however, does not give the government carte blanche to discriminate against minorities whenever the government is engaged in fashioning a remedy. In the present case, I fail to see how the exclusion of Southgate is necessary to remedy Indianola's failure to preclear its previous annexations. The remedy that the city is pursuing is to annex enough blacks so that the Justice Department will approve the 1965 annexation. It is not necessary to exclude Southgate to secure the desired preclearance. Indeed, on January 20, 1984, the Justice Department refused to preclear the 1983 annexation and the 1965 annexation, precisely because the Department found that the exclusion of Southgate was motivated by racially discriminatory considerations.

In *Fullilove* Justices Powell and Stewart indicate that the interests of "innocent" whites may be taken into account in fashioning a remedial plan, but Chief Justice Burger's plurality opinion, citing *UJO*, states, "When effectuating a limited and properly tailored remedy to cure the effects of prior discrimination, ... 'a sharing of the burden' by innocent parties is not impermissible." 448 U.S. at 484, 100 S.Ct. at 2777. Nothing in *UJO* or *Fullilove* suggests that the need to "limit and tailor" a remedial plan can justify a city's exclusion of a black segment of the population solely because inclusion would decrease the voting strength of the white population. Such an exclusion is not a "balancing process"; it is favoritism for white voters over black

voters. Furthermore, one may question just how "innocent" the white voters of Indianola are in this case. From 1965 until September 1981, the city's white population enjoyed the benefits of an electoral majority that was the result of discriminatory annexation policy.

I agree with Judge Higginbotham that the district court should not have distinguished between those blacks within the city (Classes A and B) and those excluded (Class C). If the purpose of excluding Class C was to dilute black voting strength, then all blacks were affected. Although the individual blacks in Classes A and B were not denied the right to vote, they were the victims of unlawful discrimination targeted not at the individual members of Class C but rather at Indianola blacks as a group. This type of discrimination against racial groups is precisely the kind of discrimination prohibited by the Civil War Amendments and the Voting Rights Act. The effect of that discrimination was to continue the historic caste status of blacks. *See* 42 U.S.C.A. § 1973(b) (West Supp.1983) (voting practice may not deny equal participation to "members of a class of citizens protected" by the Act); Marshall, *A Comment on the Nondiscrimination Principle in a "Nation of Minorities"*, 93 Yale L.J. 1006 (1984). I cannot reconcile this holding with a holding that Indianola could legitimately exclude any blacks whose annexation was not necessary to secure Justice Department preclearance. Indianola had a policy against annexing blacks, because they are black—except to the limited extent mandated by the Justice Department. This policy was discriminatory against blacks as a group.

I cannot fault the district court's conclusion that Mayor Fratesi's affidavit demonstrates an unlawful intent to discriminate against blacks, 551 F.Supp. at 517–18, 519–20. The court correctly interpreted the affidavit to mean that the government of Indianola wanted to avoid annexing any more blacks than necessary to secure preclearance of the 1965 annexation of white voters. Nevertheless I agree that summa-

ry judgment was inappropriate. Nonracial criteria may also have entered into the City's decision not to annex Southgate. As Judge Higginbotham correctly observes, the presence of unlawful motives does not automatically invalidate an action: the action may stand if the defendant can prove that the same decision would have resulted in the absence of the impermissible motive. Of course, even then the action may not have a discriminatory result prohibited by section 2 of the Voting Rights Act, 42 U.S.C.A. § 1973 (West Supp.1983). Indianola may not be able to meet either the mixed-motive test or the requirements of the Voting Rights Act, but it is entitled to try.

I must concur in the majority's vacating of the judgment. I note, however, that in the light of the Supreme Court's recent action in *Escambia County v. McMillan,* 1984, —— U.S. ——, 104 S.Ct. 1577, 80 L.Ed.2d 36 (per curiam), the district court should probably attempt to resolve the statutory as well as the constitutional issues. Whether or not the City's purposes were permissible, it is unlikely that they can overcome the Voting Rights Act's prohibition of discriminatory results.