WISE, MAYOR OF DALLAS, ET AL. *v.* LIPSCOMB ET AL.

No. 77–529.   Argued April 26, 1978—Decided June 22, 1978

536

WHITE, J., announced the Court's judgment and delivered an opinion, in which STEWART, J., joined. POWELL, J., filed an opinion concurring in part and concurring in the judgment, in which BURGER, C. J., and BLACKMUN and REHNQUIST, JJ., joined, *post*, p. 547. REHNQUIST, J., filed a separate opinion, in which BURGER, C. J., and STEWART and POWELL, JJ., joined, *post*, p. 549. MARSHALL, J., filed a dissenting opinion, in which BRENNAN and STEVENS, JJ., joined, *post*, p. 550.

*Joseph G. Werner* argued the cause for petitioners. With him on the brief was *Lee E. Holt.*

*James A. Johnston* argued the cause for respondents. With him on the brief were *Edward B. Cloutman III* and *Walter L. Irvin. Joaquin G. Avila, Vilma S. Martinez,* and *Morris J. Baller* filed a brief for respondents Callejo et al.

*Peter Buscemi* argued the cause *pro hac vice* for the United States as *amicus curiae* urging affirmance. With him on the brief were *Solicitor General McCree, Assistant Attorney General Days, Brian K. Landsberg,* and *Robert J. Reinstein.**

MR. JUSTICE WHITE announced the judgment of the Court and delivered an opinion in which MR. JUSTICE STEWART joined.

This case involves the recurring issue of distinguishing between legislatively enacted and judicially imposed reapportionments of state legislative bodies.

I

In 1971 respondents, Negro and Mexican-American residents of Dallas, Tex., filed suit in the United States District

---

*\*Charles A. Bane, Thomas D. Barr, Armand Derfner, Norman Redlich, Frank R. Parker, Thomas J. Ginger, Robert A. Murphy, Norman J. Chachkin,* and *William E. Caldwell* filed a brief for the Lawyers Committee for Civil Rights Under Law as *amicus curiae* urging affirmance.

Court for the Northern District of Texas against petitioners, the Mayor and members of the City Council of Dallas, the city's legislative body, alleging that the at-large system of electing council members unconstitutionally diluted the vote of racial minorities. They sought a declaratory judgment to this effect and an injunction requiring the election of councilmen from single-member districts. The complaint was dismissed for failure to state a claim, but the Court of Appeals for the Fifth Circuit disagreed and remanded. *Lipscomb* v. *Jonsson,* 459 F. 2d 335 (1972).

On January 17, 1975, after certifying a plaintiff class consisting of all Negro citizens of the city of Dallas[1] and following an evidentiary hearing, the District Court orally declared that the system of at-large elections to the Dallas City Council unconstitutionally diluted the voting strength of Negro citizens.[2] The District Court then "afforded the city an opportunity as a legislative body for the City of Dallas to prepare a plan which would be constitutional." App. 29.

On January 20, 1975, the City Council passed a resolution which stated that the Council intended to enact an ordinance which would provide for eight Council members to be elected from single-member districts and for the three remaining members, including the Mayor, to be elected at-large. This plan was submitted to the District Court on January 24, 1975. The court then conducted a remedy hearing "to determine the constitutionality of the new proposed plan by the City of Dallas." *Ibid.* After an extensive hearing, the court announced in an oral opinion delivered on February 8, 1975, that the city's plan met constitutional guidelines and was ac-

---

[1] Several plaintiffs, including all of the Mexican-American plaintiffs, were dismissed from the case for failure to respond to interrogatories. Two Mexican-Americans subsequently attempted to intervene. The District Court denied their application but later permitted several Mexican-Americans to participate in the remedy hearing held after the at-large election system was declared unconstitutional.

[2] Petitioners did not appeal this ruling and do not question it here.

ceptable and that it would issue a written opinion in the near future. Two days later, the City Council formally enacted the promised ordinance, and on March 25, the court issued a memorandum opinion containing its findings of fact and conclusions of law and again sustaining the city plan as a valid legislative Act. 399 F. Supp. 782 (1975).[3]

The Court of Appeals reversed. 551 F. 2d 1043 (1977). It held that the District Court erred by evaluating the city's actions only under constitutional standards rather than also applying the teaching of *East Carroll Parish School Bd.* v. *Marshall,* 424 U. S. 636 (1976), that, absent exceptional circumstances, judicially imposed reapportionment plans should employ only single-member districts. It concluded that no considerations existed in this case which justified a departure from this preference and remanded with instructions that the District Court require the city to reapportion itself into an appropriate number of single-member districts.[4] We granted certiorari, 434 U. S. 1008 (1978), and reverse on the grounds that the Court of Appeals misapprehended *East Carroll Parish School Bd.* and its predecessors.

## II

The Court has repeatedly held that redistricting and reapportioning legislative bodies is a legislative task which the federal courts should make every effort not to pre-empt. *Connor* v. *Finch,* 431 U. S. 407, 414–415 (1977); *Chapman* v. *Meier,* 420 U. S. 1, 27 (1975); *Gaffney* v. *Cummings,* 412 U. S. 735, 749 (1973); *Burns* v. *Richardson,* 384 U. S. 73, 84–85

---

[3] On April 1, 1975, the Dallas City Council election was held under the eight/three plan. During the pendency of the appeal the electorate approved this plan in a referendum conducted in April 1976, thus incorporating it into the City Charter.

[4] The court stated that the city may provide for the election of the Mayor by general citywide election if it desired. MR. JUSTICE POWELL stayed the Court of Appeals' judgment pending disposition by this Court. 434 U. S. 1329 (1977).

(1966). When a federal court declares an existing apportionment scheme unconstitutional, it is therefore, appropriate, whenever practicable, to afford a reasonable opportunity for the legislature to meet constitutional requirements by adopting a substitute measure rather than for the federal court to devise and order into effect its own plan. The new legislative plan, if forthcoming, will then be the governing law unless it, too, is challenged and found to violate the Constitution. "[A] State's freedom of choice to devise substitutes for an apportionment plan found unconstitutional, either as a whole or in part, should not be restricted beyond the clear commands of the Equal Protection Clause." *Id.,* at 85.

Legislative bodies should not leave their reapportionment tasks to the federal courts; but when those with legislative responsibilities do not respond, or the imminence of a state election makes it impractical for them to do so, it becomes the "unwelcome obligation," *Connor* v. *Finch, supra,* at 415, of the federal court to devise and impose a reapportionment plan pending later legislative action. In discharging this duty, the district courts "will be held to stricter standards . . . than will a state legislature . . . ." 431 U. S., at 414. Among other requirements, a court-drawn plan should prefer single-member districts over multimember districts, absent persuasive justification to the contrary. *Connor* v. *Johnson,* 402 U. S. 690, 692 (1971). We have repeatedly reaffirmed this remedial principle. *Connor* v. *Williams,* 404 U. S. 549, 551 (1972); *Mahan* v. *Howell,* 410 U. S. 315, 333 (1973); *Chapman* v. *Meier, supra,* at 18; *East Carroll Parish School Bd.* v. *Marshall, supra,* at 639.

The requirement that federal courts, absent special circumstances, employ single-member districts when they impose remedial plans, reflects recognition of the fact that "the practice of multimember districting can contribute to voter confusion, make legislative representatives more remote from their constituents, and tend to submerge electoral minorities and overrepresent electoral majorities . . . ." *Connor* v.

*Finch, supra,* at 415. See also *Chapman* v. *Meier, supra,* at 15–16. Despite these dangers, this Court has declined to hold that state multimember districts are *per se* unconstitutional. See, for example, *Whitcomb* v. *Chavis,* 403 U. S. 124 (1971); *Fortson* v. *Dorsey,* 379 U. S. 433 (1965); *Burns* v. *Richardson, supra; Chapman* v. *Meier, supra,* at 15. A more stringent standard is applied to judicial reapportionments, however, because a federal court, "lacking the political authoritativeness that the legislature can bring to the task," must act "circumspectly, and in a manner 'free from any taint of arbitrariness or discrimination.'" *Connor* v. *Finch, supra,* at 415, quoting from *Roman* v. *Sincock,* 377 U. S. 695, 710 (1964).[5]

The foregoing principles, worked out in the course of reconciling the requirements of the Constitution with the goals of state political policy, are useful guidelines and serve to decide many cases. But, as is true in this case, their application to the facts presented is not always immediately obvious. Furthermore, the distinctive impact of § 5 of the Voting Rights Act of 1965, as amended, 89 Stat. 404, 42 U. S. C. § 1973c (1970 ed., Supp. V), upon the power of the

---

[5] The numerous cases in which this Court has required the use of single-member districts in court-ordered reapportionment plans have all involved apportionment schemes which, unlike the one in this case, were held unconstitutional because they departed from the one-person, one-vote rule of *Reynolds* v. *Sims,* 377 U. S. 533 (1964), and its progeny. We are fully persuaded, however, that the same considerations which have induced this Court to express a preference for single-member districts in court-ordered reapportionment plans designed to remedy violations of the one-person, one-vote rule compel a similar rule with regard to court-imposed reapportionments designed to cure the dilution of the voting strength of racial minorities resulting from unconstitutional racial discrimination. Indeed, the Court has justified the preference for single-member districts in judicially imposed reapportionments on the ground that multimember districts "tend to submerge electoral minorities and overrepresent electoral majorities . . . ," which is the source of the very violation which the court is seeking to eliminate in racial dilution cases. *Connor* v. *Finch,* 431 U. S. 407, 415 (1977). See *White* v. *Regester,* 412 U. S. 755, 765–770 (1973).

States to reapportion themselves must be observed. Plans imposed by court order are not subject to the requirements of § 5,[6] but under that provision, a State or political subdivision subject to the Act may not "enact or seek to administer" any "different" voting qualification or procedure with respect to voting without either obtaining a declaratory judgment from the United States District Court for the District of Columbia that the proposed change "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color" or submitting the change to the Attorney General and affording him an appropriate opportunity to object thereto. A new reapportionment plan enacted by a State, including one purportedly adopted in response to invalidation of the prior plan by a federal court, will not be considered "effective as law," *Connor* v. *Finch*, 431 U. S., at 412; *Connor* v. *Waller*, 421 U. S. 656 (1975), until it has been submitted and has received clearance under § 5. Neither, in those circumstances, until clearance has been obtained, should a court address the constitutionality of the new measure. *Connor* v. *Finch, supra; Connor* v. *Waller, supra.* Pending such submission and clearance, if a State's electoral processes are not to be completely frustrated, federal courts will at times necessarily be drawn further into the reapportionment process and required to devise and implement their own plans.

## III

Texas was not subject to the Voting Rights Act when this case was pending in the District Court. Hence, insofar as federal law was concerned, when the District Court invalidated the provisions of the Dallas City Charter mandating at-large Council elections, the city was not only free but was expected to devise a substitute rather than to leave the matter

---

[6] "A decree of the United States District Court is not within reach of Section 5 of the Voting Rights Act." *Connor* v. *Johnson*, 402 U. S. 690, 691 (1971).

to the District Court. This duty, the District Court found, was discharged when the city enacted the eight/three plan of electing Council members. Noting that only if "the legislature failed in [its reapportionment] task, would the responsibility fall to the federal courts" and declaring that the plan adopted by the Council was not one "hastily conceived merely for the purposes of this litigation," 399 F. Supp., at 797, the District Court proceeded to declare the plan constitutional despite the use of at-large voting for three Council seats. Although there are some indications in the District Court's opinion that it was striving to satisfy those rules governing federal courts when they devise their own reapportionment plans, it seems to us that on balance, the District Court, as the United States observes in its *amicus* brief, reviewed the apportionment plan proposed by the Council as a legislatively enacted plan.[7]

The Court of Appeals was not in disagreement in this respect. It observed that "[t]he district court approved the City's plan for relief, which was enacted as a city ordinance following the court's decision that the prior system was unconstitutional." 551 F. 2d, at 1045. It further noted that "the election plan [was] formally adopted by the City Council." *Id.*, at 1046.

Neither did the Court of Appeals disturb the ruling of the District Court that the ordinance was constitutional. It did, however, insist that the plan also satisfy the special preference for single-member districts applicable where district courts are themselves put to the task of devising reapportionment plans and reversed the judgment of the District Court because in its view the record did not disclose the presence of those special circumstances that would warrant departure from the

---

[7] In his oral announcement, the judge remarked: "I'm not saying it's the best plan. It's not even the plan that this Court would have drawn. But this Court's not in the plan-drawing business. That's the legislative duty." Record 195.

rule. This was clearly error unless there was some convincing reason why the District Court was not entitled to consider the substitute plan under the principles applicable to legislatively adopted reapportionment plans. As we see it, no such reason has been presented.

It is suggested that the city was without power to enact the ordinance because the at-large system declared unconstitutional was established by the City Charter and because, under the Texas Constitution, Art. XI, § 5, and Texas statutory law, Tex. Rev. Civ. Stat. Ann., Art. 1170 (Vernon Supp. 1978), the Charter cannot be amended without a vote of the people. But the District Court was of a different view. Although the Council itself had no power to change the at-large system as long as the Charter provision remained intact, once the Charter provision was declared unconstitutional, and, in effect, null and void, the Council was free to exercise its legislative powers which it did by enacting the eight/three plan. 399 F. Supp., at 800; Tr. of Oral Arg. 6. When the City Council reapportioned itself by means of resolution and ordinance, it was not purporting to amend the City Charter but only to exercise its legislative powers as Dallas' governing body. The Court of Appeals did not disagree with the District Court in this respect, and we are in no position to overturn the District Court's acceptance of the city ordinance as a valid legislative response to the court's declaration of unconstitutionality.[8]

---

[8] The record suggests no statutory, state constitutional, or judicial prohibition upon the authority of the City Council to enact a municipal election plan under circumstances such as this and respondents have been unable to cite any support for its contention that the City Council exceeded its authority. It must be noted that since there is no provision under Texas law for reapportionment of Home Rule cities such as Dallas by the state legislature, or other state agency, acceptance of respondents' position would leave Dallas utterly powerless to reapportion itself in those instances where the time remaining before the next scheduled election is too brief to permit the approval of a new plan by referendum. We are

*East Carroll Parish School Bd.* v. *Marshall* does not support the conclusion of the Court of Appeals in this case that the plan presented by the city must be viewed as judicial rather than legislative. In that case the District Court instructed the East Carroll police jury and school boards to file reapportionment plans. They both submitted a multimember arrangement which the court adopted. We held that the District Court erred in approving a multimember plan because "when United States district courts are put to the task of fashioning reapportionment plans to supplant concededly invalid state legislation, single-member districts are to be preferred absent unusual circumstances." 424 U. S., at 639. In reaching this conclusion, however, we emphasized that the bodies which submitted the plans did not purport to reapportion themselves and, furthermore, could not even legally do so under federal law because state legislation providing them with such powers had been disapproved by the Attorney General of the United States under § 5 of the Voting Rights Act of 1965. 424 U. S., at 638 n. 6, 637 n. 2. Under these circumstances, it was concluded that the mere act of submitting a plan was not the equivalent of a legislative Act of reapportionment performed in accordance with the political processes of the community in question.

Even if one disagreed with that conclusion, this case is markedly different from *East Carroll Parish School Bd.* After the District Court found that the existing method of electing the City Council was constitutionally defective on January 17, 1975, it "gave the City of Dallas an opportunity to perform its duty to enact a constitutionally acceptable plan." 399 F. Supp., at 792. The City Council, the legislative body governing Dallas, promptly took advantage of this opportunity and on January 24, 1975, passed a resolution which stated "that it

unwilling to adopt such an interpretation of Texas and Dallas law in the absence of any indication whatsoever that it would be accepted by Texas courts.

is the intention of the majority of this City Council to pass an ordinance [enacting a plan of eight single-member districts with three individuals, including the Mayor, to be elected at-large]." App. 188. On February 8, 1975, the District Court announced in an oral opinion following a hearing held to consider the constitutionality of the city's plan that it was accepting the city's plan but retained jurisdiction. Two days later, on February 10, the City Council, as promised, enacted an ordinance incorporating the eight/three plan. *Id.*, at 189. In a written opinion filed subsequently, the District Court specifically found "that [the city of Dallas] has met [its constitutional] duty in enacting the eight/three plan of electing council members." 399 F. Supp., at 792. Here, unlike the situation in *East Carroll Parish School Bd.*, as the Court there viewed it, the body governing Dallas validly met its responsibility of replacing the apportionment provision invalidated by the District Court with one which could survive constitutional scrutiny. The Court of Appeals therefore erred in regarding the plan as court imposed and in subjecting it to a level of scrutiny more stringent than that required by the Constitution.[9]

Finally, it is urged that the Court of Appeals be affirmed because Texas became subject to § 5 of the Voting Rights Act while the case was pending on appeal and because under § 5, as amended, Dallas could neither enact nor seek to administer any reapportionment plan different from that in effect on November 1, 1972, without securing the clearance called for by that section. It is urged that the city ordinance of February 1975, relied upon by the District Court and

---

[9] In light of our disposition, we do not consider petitioners' claim that the Court of Appeals also erred in holding that the alleged effect of all single-member districts on the representation of Mexican-American voters and the desirability of permitting some citywide representation did not constitute special circumstances justifying departure from the preference for single-member districts in remedial reapportionments conducted by federal courts.

validly enacted prior to § 5's becoming applicable to Texas, cannot be considered as effective law until it has secured the necessary approval. The same is said with respect to the Charter amendment approved by the people of Dallas in 1976. See n. 3, *supra*.

We think it inappropriate, however, to address the § 5 issue. Respondents may, of course, seek to sustain the judgment below on grounds not employed by the Court of Appeals; but there is a preliminary question as to whether the § 5 issue is open in this Court. Respondents did not cross-petition, and sustaining the § 5 submission, even if it would not expand the relief in respondents' favor, would alter the nature of the judgment issued by the Court of Appeals. See *United States* v. *New York Telephone Co.*, 434 U. S. 159, 166 n. 8 (1977). In any event, however, we are not obligated to address the issue here, particularly where the Court of Appeals did not deal with it one way or another—apparently because it considered the plan to be a judicial product beyond the reach of the section. The impact of the Voting Rights Act on the city ordinance and on the Charter amendment approved by referendum will be open on remand, and we deem it appropriate for the Court of Appeals to deal with these questions.

The judgment of the Court of Appeals is reversed, and the case is remanded to that court for further proceedings.

*So ordered.*

MR. JUSTICE POWELL, with whom THE CHIEF JUSTICE, MR. JUSTICE BLACKMUN, and MR. JUSTICE REHNQUIST join, concurring in part and concurring in the judgment.

I agree with MR. JUSTICE WHITE's conclusion that the reapportionment plan adopted by the Dallas City Council was a "legislative plan" for purposes of review by a federal court. In my view, however, his reasoning in reaching that conclusion casts doubt on *Burns* v. *Richardson*, 384 U. S. 73 (1966).

MR. JUSTICE WHITE reads *East Carroll Parish School Bd.* v. *Marshall,* 424 U. S. 636 (1976), as establishing the principle that a proposed reapportionment plan cannot be considered a legislative plan if the political body suggesting it lacks legal power to reapportion itself. *Ante,* at 545. Because the City Council ordinarily would have had no power to reapportion itself—a Charter amendment being necessary to that end— MR. JUSTICE WHITE is constrained to assume that the Council became imbued with such power after the District Court struck down the apportionment provisions of the City Charter. Aside from the fact that this aspect of Texas law was neither fully briefed nor argued, the assumption seems unnecessary.

In *Burns* v. *Richardson, supra,* the Hawaii Legislature was without power to reapportion itself, a constitutional amendment being required for that purpose. Nevertheless, this Court treated the plan that the legislature proposed to submit to the voters as a legislative plan. By parity of reasoning, the plan proposed by the Dallas City Council in this case must be considered legislative, even if the Council had no power to reapportion itself. The Council plan was then implemented by court order, 399 F. Supp. 782, 798 (ND Tex. 1975), just as the legislature's plan in *Burns* ultimately was imposed pending the outcome of the constitutional amendment process, 384 U. S., at 98.

The essential point is that the Dallas City Council exercised a legislative judgment, reflecting the policy choices of the elected representatives of the people, rather than the remedial directive of a federal court. As we held in *Burns, supra,* at 85, "a State's freedom of choice to devise substitutes for an apportionment plan found unconstitutional, either as a whole or in part, should not be restricted beyond the clear commands of the Equal Protection Clause." This rule of deference to local legislative judgments remains in force even if, as in *Burns,* our examination of state law suggests that the local body lacks authority to reapportion itself.

Thus, MR. JUSTICE WHITE's statement that *East Carroll School Bd.* stands for the proposition that a plan submitted by a political body without power to reapportion itself cannot be considered a legislative plan appears to be in direct conflict with *Burns.* Because the brief *per curiam* in *East Carroll* did not even cite *Burns,* I would read it as turning on its peculiar facts. In response to the litigation in *East Carroll,* the legislature enacted a statute enabling police juries and school boards to reapportion themselves by employing at-large elections. That enabling legislation was disapproved by the Attorney General of the United States under § 5 of the Voting Rights Act of 1965, as amended, 42 U. S. C. § 1973c (1970 ed., Supp. V), because of its impermissible impact on Negro voters. This determination meant that the specific plans proposed by the school board and police jury in that case would have had unlawful effects. Because their legislative judgment had been found tainted in that respect, it followed that the normal presumption of legitimacy afforded the balances reflected in legislative plans, see *Burns, supra,* at 84–85, could not be indulged. To the extent that *East Carroll* implies anything further about the principle established in *Burns,* the latter must be held to control.

Having determined on the basis of *Burns* that the City Council plan was legislative, I agree with MR. JUSTICE WHITE's conclusion that the judgment of the Court of Appeals must be reversed. I also agree that there is no reason for this Court to explore difficult questions concerning § 5 of the Voting Rights Act in the absence of consideration by the courts below.

Opinion of MR. JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE, MR. JUSTICE STEWART, and MR. JUSTICE POWELL join.

I write separately to emphasize that the Court today is not presented with the question of whether the District Court erred in concluding that the form of government of the city of

Dallas unconstitutionally diluted the voting power of black citizens. While this Court has found that the use of multi-member districts in a state legislative apportionment plan may be invalid if "used invidiously to cancel out or minimize the voting strength of racial groups," *White* v. *Regester,* 412 U. S. 755, 765 (1973), we have never had occasion to consider whether an analogue of this highly amorphous theory may be applied to municipal governments. Since petitioners did not preserve this issue on appeal, we need not today consider whether relevant constitutional distinctions may be drawn in this area between a state legislature and a municipal government. I write only to point out that the possibility of such distinctions has not been foreclosed by today's decision.

Mr. Justice Marshall, with whom Mr. Justice Brennan and Mr. Justice Stevens join, dissenting.

I agree with the majority's decision not to reach the Voting Rights Act question, since it was not presented to either of the courts below. I also agree with the analysis of our past decisions found in Part II of Mr. Justice White's opinion. I cannot agree, however, that the actions of the Dallas City Council are distinguishable from those of the local governing body in *East Carroll Parish School Bd.* v. *Marshall,* 424 U. S. 636 (1976). I therefore conclude that the plan ordered by the District Court here must be evaluated in accordance with the federal common law of remedies applicable to judicially devised reapportionment plans.

I

In *East Carroll Parish School Bd.* v. *Marshall, supra,* suit against the parish (county) was initially brought by a white resident who claimed that population disparities among the wards of the parish unconstitutionally denied him an equal vote in elections for members of the school board and the police jury, the governing body of the parish. Following a

finding of unconstitutionality, the District Court adopted a plan submitted by the police jury, which called for at-large elections of both bodies. Two years later (after the 1970 census), in response to the court's direction, the at-large plan was resubmitted by the police jury. Respondent Marshall then intervened, arguing that the at-large elections would dilute the Negro vote in violation of the Fourteenth and Fifteenth Amendments. The District Court again accepted the police jury plan, but the Court of Appeals reversed, holding that multimember districts were unconstitutional.

Although we did not reach the constitutional ground relied on by the Court of Appeals, we sustained its judgment. We concluded that the District Court had abused its equitable discretion in not requiring the division of the parish into single-member wards:

> "We have frequently reaffirmed the rule that when United States district courts are put to the task of fashioning reapportionment plans to supplant concededly invalid state legislation, single-member districts are to be preferred absent unusual circumstances." 424 U. S., at 639.

It is plain from the foregoing that we treated the plan submitted by the local legislative body in *East Carroll* as a judicially devised plan, to which the federal common law of remedies developed in reapportionment cases was applicable. It is equally plain that we did not treat the police jury's submission as a "legislatively enacted" plan, which would only have had to meet the strictures of the Constitution and would not necessarily have been subject to evaluation under the more stringent standards applicable to court-devised plans. See *Connor* v. *Finch*, 431 U. S. 407, 414–415 (1977). Indeed, in rejecting the argument of the United States (appearing as *amicus curiae*) that the *East Carroll* plan was subject to the preclearance procedure of § 5 of the Voting Rights Act of 1965, we expressly noted that the police jury "did not have the authority to reapportion itself," and that the plan, though sub-

mitted by the police jury, was a "court-ordered pla[n] resulting from equitable jurisdiction over the adversary proceedings." 424 U. S., at 638–639, n. 6.

There is no meaningful distinction between the facts here and the facts in *East Carroll*. Like the police jury in *East Carroll*, the City Council of Dallas did not act pursuant to any state enabling legislation governing the procedures for reapportioning itself when it first proposed the eight/three plan to the District Court in January 1975. Nor did it act pursuant to any state-derived authority when it "enacted" the plan following the District Court's first approval of it in March 1975. Under the terms of its Charter, the Dallas City Council could reapportion itself only by a popular referendum. See Tex. Const., Art. XI, § 5; Tex. Rev. Civ. Stat. Ann., Art. 1170 (Vernon Supp. 1978). The Council unquestionably failed to comply with the existing state procedures for enacting a reapportionment plan; indeed, the District Court itself noted that, were the Dallas City Council not responding to a judicial finding of unconstitutionality, it would have been acting unlawfully in unilaterally reapportioning itself. 399 F. Supp. 782, 800 (ND Tex. 1975).

That this plan was not devised by the City Council in the usual course of its legislative responsibilities is further evidenced by the fact that the Council told a group of Mexican-American citizens, who wished to present for the Council's deliberations an alternative, single-member district plan, that they were in the "wrong forum" and should go to federal court. App. 43–44. It seems clear that the eight/three plan was proposed less as a matter of legislative judgment than as a response by a party litigant to the court's invitation to aid in devising a plan. Indeed, the District Court itself appeared at times to regard the eight/three plan as a court-devised plan in which at-large voting had to be justified by special and unique circumstances. See *ante,* at 543 (opinion of WHITE, J.).

It is suggested that the City Council here, unlike the police jury in *East Carroll,* purported to reapportion itself when it first submitted the eight/three plan. See *ante,* at 545 (opinion of WHITE, J.). But that simply is not the case. This plan was initially proposed not in the form of a formal, binding enactment but merely as an expression of the Council's "intention." App. 188. The Council did not even bother to go through the formality of enacting a supposedly binding ordinance until after the District Court, following a full hearing, indicated that it approved of the plan as a remedy for the constitutional violations; the procedures followed prior to the time when the District Court ordered implementation of the eight/three plan, moreover, were insufficient under state law validly to change the structure of the Council.

While our past decisions have held that a legislatively enacted reapportionment plan is the preferred response to a judicial finding of unconstitutional apportionment, I do not believe that these cases contemplated that a legislature could meet this responsibility—and thereby avoid the requirements applicable to court-devised plans—by making a submission not in accordance with valid state procedures governing legislative enactments.[1] If the plan submitted in *East Carroll* was properly regarded as a judicially devised plan,

---

[1] I do not agree with my Brother POWELL that *Burns* v. *Richardson,* 384 U. S. 73 (1966), stands for the proposition that any legislative submission whatsoever should be treated as a "legislative plan." In *Burns,* the very mechanism by which changes in apportionment could be made under state law had been found by the District Court to be designed to freeze existing unconstitutional apportionments and had thus been held unconstitutional in its own right. 238 F. Supp. 468, 472 (Haw. 1965). Here, by contrast, there was a lawful mechanism available for modifying the apportionment under the Dallas City Charter: the drafting of a proposal by the Council and its submission to the voters of the city at a popular referendum. If this process could not be completed in time for the next election, then the District Court would be justified in devising a temporary, court-ordered plan. See *ante,* at 540 (opinion of WHITE, J.). See also *Connor* v. *Williams,* 404 U. S. 549, 552, and n. 4 (1972).

then the plan before us today must also be so regarded, and I see no reason to depart from the clear implications of this unanimous decision of the Court rendered only two Terms ago. I therefore conclude that the Court of Appeals properly evaluated this plan under the standards of the federal common law, which has for years recognized that multimember districts and at-large voting are presumptively disfavored.

## II

Even if this plan were properly to be viewed as a "legislatively enacted" plan, however, the majority's apparent assumption that it represents a proper remedy would nonetheless be troubling. Where the very nature of the underlying violation is dilution of the voting power of a racial minority resulting from the effects of at-large voting in a particular political community, I believe that it is inappropriate either for the local legislative body or a court to respond with more of the same.

Although we have refrained from holding that multimember districts are unconstitutional *per se,* the presumption in favor of single-member districts as a matter of federal remedial law is a strong one. See, *e. g., Connor* v. *Johnson,* 402 U. S. 690 (1971); *Connor* v. *Williams,* 404 U. S. 549, 551 (1972); *Chapman* v. *Meier,* 420 U. S. 1, 16–19 (1975). We have repeatedly explained this preference by virtue of the fact that multimember districts "tend to submerge electoral minorities and overrepresent electoral majorities." *Connor* v. *Finch,* 431 U. S., at 415; accord, *Whitcomb* v. *Chavis,* 403 U. S. 124, 158–159 (1971). See also *Chapman* v. *Meier, supra,* at 16.

In the instant case, it is essentially undisputed that the use of a multimember district (the city of Dallas) for the at-large election of all City Council members had "submerged" an electoral minority, the Negro voters of Dallas. In this respect the case is unlike *East Carroll,* where the original electoral scheme was invalidated solely on the ground of mal-

apportionment and where the "racial dilution" challenge was raised only in objection to the proposed remedy. Multi-member districts, which are disfavored as court-devised remedies because of their "tendency" or potential to create racial dilution, should *a fortiori* be disfavored when they are proposed to cure a *proved* use of a "multi-member . . . scheme . . . to minimize or cancel out the voting strength of racial . . . elements of the voting population." *Fortson* v. *Dorsey*, 379 U. S. 433, 439 (1965).[2]

Based on respondents' proof of a diluting effect on Negro voting strength in Dallas—and of the long history of *de jure* discrimination contributing to it—the District Court held the Dallas scheme to be unconstitutional. Although the Council did not challenge the finding that the at-large election of all its members was unconstitutional, the plan it submitted to the District Court replicated the offending feature of its original scheme by providing for the at-large election of three Council members. To put the burden on respondents to prove that the submission, insofar as it perpetuates at-large voting for Council members, is as unconstitutional as the original plan seems contrary to logic and common sense. I cannot agree that either the Constitution or the remedial principles of equity require such a result.

For both of these reasons, I believe that the Court of Appeals correctly held that the use of at-large voting for City Council members in the city of Dallas should not have been approved as part of the remedy in this case by the District Court. I therefore dissent.

---

[2] In *White* v. *Regester*, 412 U. S. 755, 765–770 (1973), this Court affirmed a District Court order directing that an unconstitutional multi-member district be reapportioned into single-member districts designated by the court. The District Court had found the multimember district to be unconstitutional because of its dilutive effect on Negro voting strength, and had ordered implementation of its remedy without awaiting a legislative response to its finding of unconstitutionality. See *Graves* v. *Barnes*, 343 F. Supp. 704 (WD Tex. 1972) (three-judge court).