**A. M. SEAMON**

v.

**Chet UPHAM, et al.**

**Civ. A. No. P–81–49–CA.**

United States District Court,
E. D. Texas,
Paris Division.

April 6, 1982.

Leighton Cornett, Paris, Tex., for plaintiff.

David R. Richards, Austin, Tex., for Juanita Craft, et al.

Luis M. Segura, Jesse Roy Botello, San Antonio, Tex., for M. Garcia, A. Luna, A. Gonzales, B. Eureste, R. Padilla, R. Palomo, M. Tamez, R. Cristan and H. DeHoyos.

George J. Korbel, Jose Camacho, Austin, Tex., for B. Gonzales, A. Dolorosa and J. Adame.

John M. Harmon and R. James George, Jr., Graves, Dougherty, Hearon & Moody, Austin, Tex., for Eric Clifford and Chester Upham.

Joaquin G. Avila, Mexican American Legal Defense and Educational Fund, San Antonio, Tex., for A. Garcia and J. Rodriguez.

Rafael Quintanilla, Jr., Austin, Tex., for Democratic Party of Texas.

Robert C. Slagle, Jr., pro se.

R. C. Slagle, III, Sherman, Tex., for Brady Fisher.

Steve Bickerstaff, Richard E. Gray, III, Asst. Atty. Gen., Austin, Tex., for William Clement, Geo. Strake, State of Texas.

James Allison, Asst. Atty. Gen., Austin, Tex., for Roger Peterson and Margaret Coplin.

Before SAM D. JOHNSON, Circuit Judge, JUSTICE, Chief District Judge, and PARKER, District Judge.

BY THE COURT:

On February 27, 1982, this Court, 536 F.Supp. 931, entered a remedial decree—a temporary interim plan—that apportioned Texas' twenty-seven congressional districts. As noted in its opinion accompanying the remedial decree, this Court turned to the guidance provided by the experiences of other federal courts placed in the political thicket of apportionment. This assistance is not generally in the form of affirmative prescriptions and directions regarding the proper methodology and procedure to be utilized in fashioning apportionment plans. Instead, it is in the form of warnings and admonitions against taking certain actions or setting certain goals. This Court's reading and interpretation of these generalized admonitions led to the conclusion that the task of reapportioning congressional districts belongs to the state legislature in the first instance, and the federal court should make every effort not to preempt the state legislature's primary jurisdiction and responsibility. This conclusion was expressly stated in the Court's opinions of February 27, 1982.

The State of Texas, however, had failed to institute a legally enforceable apportionment plan. Senate Bill No. 1 (S.B. 1), which was passed by the first called session of the 67th Legislature of Texas, was the state legislature's attempt. S.B. 1, however, never became effective as a matter of law. It was submitted to the Attorney General of the United States for preclearance on or about September 11, 1981. By a letter dated January 29, 1982 to the Secretary of State of the State of Texas, the United States Attorney General interposed an objection to S.B. 1 as provided for in 42 U.S.C. § 1973c.

This objection rendered all the provisions of S.B. 1 legally unenforceable. There appears to be no question that S.B. 1, as a practical and legal matter, never became effective at all. Indeed, the State of Texas attempted to persuade the Department of Justice to "preclear" the specific portions of the legislative enactment to which the Department found no statutory objection. The Department of Justice, by letter dated February 23, 1982, refused to attempt such an act. In its refusal, the Department recognized that "when the issue was addressed by a federal court, the court held that the effect of such an objection is to render the entire act unenforceable. *Pitts v. Busbee*, 511 F.2d 126, 129 n.2 (5th Cir. 1975)." *See Georgia v. United States*, 411 U.S. 526, 93 S.Ct. 1702, 36 L.Ed.2d 472 (1973). In its opinion in the case *sub judice*, the Supreme Court recognized that the § 5 objection to S.B. 1 went to the entire plan and S.B. 1 was legally unenforceable.

Since an enforceable legislative enactment appeared to be precluded, this Court was asked to implement a remedial decree of its own. Consequently, the Court attempted to glean from the Supreme Court's admonitions what standards should be applied when there was no enforceable apportionment plan in existence. A majority of this Court concluded that, while it should pay deference to state proposals, it was not required to summarily accept portions of a state proposal that had not been specifically objected to by the Justice Department. Additionally, it concluded it was not required to determine the constitutionality of a legally nonexistent state legislative apportionment plan.

Indeed, the generalized guidance of the Supreme Court appeared to dictate the contrary. This Court determined it was foreclosed from ruling on the question of the constitutionality of S.B. 1, since the apportionment plan was never precleared pursuant to the relevant statutes. *See McDaniel v. Sanchez*, 452 U.S. 130, 101 S.Ct. 2224, 68 L.Ed.2d 124 (1981), *quoting Wise v. Lip-*

*scomb,* 437 U.S. 535, 542, 98 S.Ct. 2493, 2498, 57 L.Ed.2d 411 (1978); *Conner v. Finch,* 431 U.S. 407, 412 (1977); *United States v. Board of Supervisors,* 429 U.S. 642, 646–47, 97 S.Ct. 833, 835, 51 L.Ed.2d 106 (1977); *Conner v. Waller,* 421 U.S. 656, 95 S.Ct. 2003, 44 L.Ed.2d 486 (1975). Since the legislative enactment never attained legal existence, it did not appear, as a practical matter, that a constitutional analysis could be conducted. In order to determine the constitutionality of a state apportionment plan, this Court would need to examine the legislature's purpose in passing the statute. However, since S.B. 1—the legislature's solitary effort at congressional apportionment—was not legally in existence, there appeared to be no legislative purpose to analyze. This Court was required to start from scratch. Whatever plan it instituted would be the only plan in existence, it would be the plan reviewed by any other court, and S.B. 1—together with its expressions of state policy choices—was apparently only a statement of what was considered desirable by the State.

With this statement of legislative preference, this Court began the process of apportioning the State of Texas. In doing so, two rules were followed. First, in fashioning a remedial decree, a district court is held to stricter standards than a state legislature. Second, this Court, in fashioning its remedial decree, should follow the appropriate section 5 standards, including the body of administrative and judicial precedents developed in section 5 cases. *McDaniel v. Sanchez,* 101 S.Ct. at 2235. In other words, this Court appeared to be required to devise a plan that had neither a racially discriminatory purpose nor such an effect. 42 U.S.C. § 1973c; *Beer v. United States,* 425 U.S. 130, 96 S.Ct. 1357, 47 L.Ed.2d 629 (1976).

This Court attempted to implement just such a remedial decree. In doing so, it deferred to the judgment of the Texas State Legislature in every instance it found consistent with a court-ordered apportionment plan. The Court recognized that, in fashioning a reapportionment plan, a district court should not preempt a legislative task or intrude upon state policy any more than necessary.

This Court, however, found it necessary to reject the state legislature's proposal regarding Districts 3, 5, 24, and 26, which did not comply with the applicable section 5 standards by which this Court considered itself bound. This refusal to defer was not a result of any finding of a constitutional or statutory violation. Rather, this Court's refusal to defer to the state legislature's plan as it pertained to Districts 3, 5, 24, and 26 was considered necessary because a court-ordered plan is adjudged under more stringent standards than are applicable to legislative enactments. Because no legally enforceable plan was in existence, and because these districts, as drawn by the legislature, would have resulted in a severe and extreme retrogression in minority voting strength, the Court concluded these racially unfair districts could not validly be included in a court-ordered plan. The Court, therefore adopted a plan that, on the basis of evidence adduced, would avoid the retrogressive effects of S.B. 1, which are precluded from court-ordered plans.

This decision, as expected, was appealed to the Supreme Court. The Supreme Court apparently agreed that "S.B. 1's treatment of Dallas failed to meet the test of racial fairness for a court-ordered plan." The Supreme Court, however, indicated a district court's refusal to adopt any part of a state legislative enactment must be predicated and founded upon a finding that the precise and specific area of concern violates the Voting Rights Act or is unconstitutional.

Until the Supreme Court's determination in this case, this question was open. The Supreme Court stated, "We have never said that the entry of an objection by the Attorney General [of the United States] to any part of a state plan grants a district court the authority to disregard aspects of the legislative plan not objected to by the Attorney General." Of course, the Court had never expressly indicated the contrary. As noted above, the implication was that the entry of an objection by the United States

Attorney General rendered the entire legislative plan a nullity. *Georgia v. United States*, 411 U.S. 526, 93 S.Ct. 1702, 36 L.Ed.2d 472 (1973). This fact, combined with a determination that certain aspects of the proposal would be racially unfair, implied that a court charged with the equitable duty of fashioning a court-ordered plan was required to disregard aspects of the legislative proposal.

The Supreme Court, in reaching its conclusion, relied primarily upon two of its earlier rulings. *White v. Weiser*, 412 U.S. 783, 93 S.Ct. 2348, 37 L.Ed.2d 335 (1973); *Whitcomb v. Chavis*, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971). This Court, of course, had acknowledged the holdings of these cases, and determined they stood for the proposition that in fashioning a reapportionment plan, or in choosing among plans, a district court should not preempt the legislative task or intrude upon state policy any more than necessary. However, these cases were not understood to stand for the proposition that it was improper to reject the state proposal, if there had been a section 5 objection that rendered the entire proposal legally unenforceable and nonexistent and the district court determined the specific portion of the proposal—although not specifically objected to by the United States Attorney General—was racially unfair under the standards imposed upon courts.

To illustrate, in *White v. Weiser*, unlike the case *sub judice*, there had been no section 5 objection rendering the State of Texas' plan legally unenforceable. The district court in *Weiser* held the legislative enactment apportioning the State of Texas unconstitutional and was faced with making a decision regarding which of two proposed plans was more appropriate to institute as a court-ordered plan. In making its decision, the district court refused to adopt one of two proposals that more closely approximated the state legislative proposal than the plan ultimately adopted. In doing so, the district court made no determination that the plan it refused to adopt was racially unfair and would have the effect of diluting minority voting strength.

*Whitcomb v. Chavis* also involved no section 5 objection to the plan in question. It involved a constitutional challenge to multimember districts. The district court declared the plan unconstitutional and instituted a plan expressly aimed at giving "recognition to the cognizable racial minority group whose grievance lead [sic] to this litigation." *Whitcomb v. Chavis* at 1867. The Supreme Court, in reversing the district court, emphasized that multi-member districts are not per se illegal under the equal protection clause, and that the district court erred in finding the plan unconstitutional because individuals are not entitled to proportional representation. Additionally, the Supreme Court held the district court was wrong to eliminate all multi-member districts in the state because the district court had made no determination about the racial fairness of the multi-member districts in parts of the state other than those specifically challenged. As such, the district court "erred in so broadly brushing aside state apportionment policy without solid constitutional *or equitable* grounds for doing so." [1] *Whitcomb v. Chavis* at 1878 (emphasis added).

Nevertheless, the Supreme Court has spoken. It now says, without delineating the applicable standards, that it is improper not to adopt a state's legally unenforceable plan

1. The Supreme Court in the case *sub judice* also refers to the case of *Chapman v. Meier*, 420 U.S. 1, 95 S.Ct. 751, 42 L.Ed.2d 766 (1975). In *Chapman* there was no § 5 objection that rendered the state plan legally unenforceable. The case does stand for the proposition that "court-ordered plans should, in some circumstances, defer to, or respect, a state policy of multi-member districts." However, the Supreme Court ordered the district court to institute single-member districts as part of its court-ordered plan absent insurmountable difficulties. The Supreme Court emphasized there are different standards between plans implemented by a federal court and a state legislature.

This Court attempted to heed the apparent admonition of such language by articulating its refusal to adopt as part of a court-ordered plan any portion of a state proposal that was racially unfair.

unless the specific aspect of the state's proposal amounts to a constitutional or statutory violation.

Together with this determination, the Supreme Court left it to this Court "in the first instance to determine whether to modify its judgment and reschedule the primary elections for Dallas County, or, in spite of its erroneous refusal to adopt the S.B. 1 districts for Dallas County, to allow the election to go forward in accordance with the present schedule."

For the purpose of making this determination, a hearing was held on April 5, 1982. At this hearing, two issues were addressed. The first issue involved the question of whether the party primary elections should be held on May 1, 1982. The second issue addressed was whether the 1982 congressional elections should be conducted under the court-ordered apportionment plan or under S.B. 1. The Court accepted evidence in the form of affidavits by candidates for public office, party officials, and others charged with the administration of elections. Additionally, the Court heard argument by counsel for the parties to the instant litigation.

As a result of this hearing, this Court determined it is crucial that the May 1st primary date be respected and the Dallas County elections be held on that date—the date of all other primary elections in the State of Texas. All Court activity to this point has been to effectuate that goal. As this Court has indicated before, the exercise of its unwelcome judicial responsibility was taken solely for the purpose of ensuring and facilitating, to the degree practicable, a timely and orderly elective process. The people of Dallas County, the people of Districts 3, 5, 24, and 26, and the people of Texas are entitled to such a process.

The May 1, 1982 primary is merely twenty-six days away. Since February 27, 1982, the election process in the State of Texas has been completely directed toward the May 1st party primaries. All those interested in the outcome of the elections to be held in Districts 3, 5, 24, and 26—candidates, election officials, and voters—have focused their respective efforts on an election on May 1, 1982. Despite the numerous complications resulting from this litigation, this Court has preserved the integrity of the May 1st primary election.

To delay the May 1st primary at this late date would result in substantial damage. Initially, the monetary cost—for the candidates, for the political parties, and for the State—of an entirely separate primary would be considerable. Additionally, late changes in the party primary date, in all likelihood, would produce voter confusion concerning both issues and candidates. It is beyond argument that such a result is counter-productive. Moreover, delayed election dates historically result in diminished voter participation. Such a result is particularly onerous for minority voters and candidates who benefit from high rates of participation. In any event, the system of self-governance is strengthened by enhancing the opportunity for voter participation.

For these reasons, the State of Texas, through its attorneys, supports the position that the May 1, 1982 primary date should be maintained.

This Court has also determined that imposing S.B. 1's configurations for Districts 3, 5, 24, and 26 without delaying the May 1st primary would be too disruptive an alternative. Changing the district configurations from those currently in force would require time to effectuate broad changes, including accurate voter registration, proper absentee voter application and processing of absentee ballots, apprising voters regarding districts of their residence, and allowing candidates to appraise, evaluate, organize, and take other action necessary to prepare themselves for election. These changes are made particularly difficult because Texas primary elections are the basic responsibility of political parties. As such, to effectuate any necessary changes, the political party officials would be faced with coordinating their efforts not only within their respective parties, but also with public election administrators and others as required by the election laws of the State of Texas.

In evaluating the effects of these changes, the Court considered flatly contradictory affidavits. To illustrate, Frederick R. Meyer, Dallas County Chairman of the Republican Party, stated that "[t]he Republican Party of Dallas County is capable of holding the Primary Election on May 1, 1982, with the Congressional district lines drawn as per SB–1." In contrast, John Childs, who as Tax Assessor-Collector of Dallas County is in charge of preparing official voter registration lists stated that "to change the congressional boundaries [to S.B. 1] at this date will seriously impair and undermine the May 1, 1982 primary elections."

Indeed, one Dallas County election official, Conny Drake, gave diametrically opposed statements on two separate occasions. In an affidavit addressed to the Supreme Court of the United States and dated March 24, 1982, she testified, "Any change in any line of apportionment involving Dallas County would completely preclude Dallas County from conducting a May 1st primary. Even if any change complied with current election precincts, the May 1st primary would be impossible to conduct." However, in an affidavit addressed to this Court and dated April 2, 1982, she stated, "On the basis of my personal knowledge, it is my opinion that primary elections can be held on May 1, 1982 under the redistricting lines provided in S.B. 1." Of course, to hold a primary election under the redistricting lines provided in S.B. 1 would require the change in apportionment lines that Conny Drake previously indicated would preclude an election.

On every crucial factual issue, the evidence was widely disparate. Some of the disparities perhaps are explainable by virtue of practical differences between party affiliations, practical differences between county machinery, and differences in the experience or responsibility of the affiant. An attorney for the State of Texas, expressing the difficulty faced by his office, stated that the State had received "conflicting signals" concerning the feasibility of conducting a May 1st primary under S.B. 1.

Ultimately, it is difficult to make a determination based upon the morass of contradictory testimony. It is, however, clear that to change the Dallas County district configurations from those currently in force would create, at best, uncertainty. In all likelihood, such changes would create chaos and confusion in the minds of voters and seriously disrupt the electoral process. It is equally clear that such a result will be avoided by holding the May 1st primary elections under the Court's plan of February 27, 1982.

Since this Court determines that, as a matter of necessity, it is imperative to preserve the integrity of the May 1st primary and not to change the Dallas County district configurations from those currently in force, it was ordered on April 5, 1982 that this Court's order of February 27, 1982, will remain in effect as a temporary interim plan for the 1982 primary and general elections. This Court expressly retains jurisdiction over this proceeding.

Neither the order entered April 5, 1982 nor the instant opinion expresses any determination regarding the constitutionality of S.B. 1.[2] Such a determination is unnecessary at this time.

Judge Parker concurs in the determination to preserve the integrity of the May 1st primary, but would institute S.B. 1 and notes his dissent to that part of the instant opinion. Judge Parker also reserves the right to file a supplemental opinion.

---

**2.** Judge Justice adheres to his earlier opinion entered February 27, 1982 that S.B. 1 is unconstitutional as detailed in that opinion.