[J-1-2018] [MO: Todd, J.]

# IN THE SUPREME COURT OF PENNSYLVANIA
## MIDDLE DISTRICT

| | |
|---|---|
| LEAGUE OF WOMEN VOTERS OF PENNSYLVANIA, CARMEN FEBO SAN MIGUEL, JAMES SOLOMON, JOHN GREINER, JOHN CAPOWSKI, GRETCHEN BRANDT, THOMAS RENTSCHLER, MARY ELIZABETH LAWN, LISA ISAACS, DON LANCASTER, JORDI COMAS, ROBERT SMITH, WILLIAM MARX, RICHARD MANTELL, PRISCILLA MCNULTY, THOMAS ULRICH, ROBERT MCKINSTRY, MARK LICHTY, LORRAINE PETROSKY, | : No. 159 MM 2017<br>:<br>: On the Recommended Findings of Fact<br>: and Conclusions of Law of the<br>: Commonwealth Court of Pennsylvania<br>: entered on 12/29/18 at No. 261 MD<br>: 2017<br>:<br>: |
| Petitioners | : ARGUED: January 17, 2018<br>:<br>:<br>: |
| v. | :<br>:<br>:<br>: |
| THE COMMONWEALTH OF PENNSYLVANIA; THE PENNSYLVANIA GENERAL ASSEMBLY; THOMAS W. WOLF, IN HIS CAPACITY AS GOVERNOR OF PENNSYLVANIA; MICHAEL J. STACK III, IN HIS CAPACITY AS LIEUTENANT GOVERNOR OF PENNSYLVANIA AND PRESIDENT OF THE PENNSYLVANIA SENATE; MICHAEL C. TURZAI, IN HIS CAPACITY AS SPEAKER OF THE PENNSYLVANIA HOUSE OF REPRESENTATIVES; JOSEPH B. SCARNATI III, IN HIS CAPACITY AS PENNSYLVANIA SENATE PRESIDENT PRO TEMPORE; ROBERT TORRES, IN HIS CAPACITY AS ACTING SECRETARY OF THE COMMONWEALTH OF PENNSYLVANIA; JONATHAN M. MARKS, IN HIS CAPACITY AS COMMISSIONER OF THE BUREAU OF COMMISSIONS, ELECTIONS, AND LEGISLATION OF | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

THE PENNSYLVANIA DEPARTMENT OF : 
STATE, :
 :
 Respondents :

**DISSENTING OPINION**

JUSTICE MUNDY                                         FILED:  February 7, 2018

I respectfully dissent.  Today the Majority announces that the Pennsylvania Congressional Redistricting Act of 2011 clearly, plainly and palpably violates the Pennsylvania Constitution on the basis of the Free and Equal Elections Clause.  *See generally* PA. CONST. art. I, § 5.  The claim here is not that voters were unable to cast their vote, but rather that the power of the individual voters was diluted, thus preventing them from electing candidates of their choice.  The Majority concedes, "[n]either Article 1, Section 5, nor any other provision of our Constitution, articulates explicit standards which are to be used in the creation of congressional districts."  Majority Op. at 119.  Nevertheless, the Majority holds that "certain neutral criteria" are to be utilized in drawing congressional districts in this Commonwealth.  *Id.*

In *Erfer v. Commonwealth*, 794 A.2d 325 (Pa. 2002), a partisan gerrymandering case, this Court rejected the "[p]etitioners' claim that the Pennsylvania Constitution's free and equal elections clause provides further protection to the right to vote than does the Equal Protection Clause."  *Id.* at 332.  The Court further noted that the petitioners had failed to persuade us "why we should, at this juncture, interpret our constitution in such a fashion that the right to vote is more expansive than the guarantee found in the federal constitution."  *Id.*  Despite the fact that *Erfer* established the Free and Equal Elections Clause did not provide any heightened protections to Pennsylvania voters, the Majority fails to provide legal justification for its disapproval of *Erfer*, other than citing to

*Shankey v. Staisey*, 257 A.2d 897 (Pa. 1969), which pre-dates *Erfer* by 33 years. In my view, *stare decisis* principles require us to give *Erfer* full effect.

Recognizing that the Pennsylvania Constitution does not articulate explicit standards to be used in the creation of congressional districts, the Majority fashions a three part test: "(1) the population of such districts must be equal, to the extent possible; (2) the district that is created must be comprised of compact and contiguous geographical territory, and (3) the district respects the boundaries of existing political subdivisions contained therein, such that the district divides as few of those subdivisions as possible." Majority Op. at 120-121. These vague judicially-created "neutral criteria" are now the guideposts against which all future congressional redistricting maps will be evaluated, with this Court as the final arbiter of what constitutes too partisan an influence. *Id.* at 123.

In this regard, the Majority acknowledges that these "neutral criteria" only establish a constitutional floor. Majority Op. at 123. However, the Majority admits that it is possible for the General Assembly to draw a map that fully complies with the Majority's "neutral criteria" but still "operate[s] to unfairly dilute the power of a particular group's vote for a congressional representative." *Id.* at 124. This undermines the conclusion that there is a clear, plain, and palpable constitutional violation in this case.

As I explained in my January 22, 2018 Dissenting Statement, I also have grave concerns about the Majority's remedy. I agree with the Majority that we have the authority to direct the legislative and executive branches of our government to draw new maps to remedy any violation of law. However, I am troubled by the Majority's decision to strike down the 2011 congressional map on the eve of the 2018 midterm election. Particularly its disregard for precedent which supports deferring redistricting until after the 2018 election. *See generally Butcher v. Bloom*, 203 A.2d 556, 568 (Pa. 1964). I

further share the concerns expressed by the dissenting opinion of Chief Justice Saylor and the dissenting portion of the concurring and dissenting opinion of Justice Baer that this is a political process the General Assembly should be afforded the full opportunity and adequate time to address. I write further only to address the remedy suggested by the Majority of bestowing the task of drawing a new Congressional map onto itself in the face of a clear legislative alternative.[1]

The Majority states it fully supports the "preferred path of legislative and executive action," and concedes "that the primary responsibility and authority for drawing federal congressional legislative districts rests squarely with the state legislature." Majority Op. at 132. Notwithstanding this, the Majority declares its remedy "was well within our judicial authority, and supported by not only our Constitution and statutes . . . but by Commonwealth and federal precedent, as well as similar remedies provided by the high courts of other states acting when their sister branches fail to remedy an unconstitutional plan." *Id.* at 133.

The Majority cites *Butcher* as support for its remedy, but omits that the Court in *Butcher* granted the General Assembly 11 months to draft a new map before intervening, yet it nevertheless concludes its remedy is "entirely consistent with . . . *Butcher.*" *Id.* This Court has always had the pragmatic option to utilize the current congressional maps for the 2018 election, while allowing the General Assembly the appropriate amount of time to redraw our legislative districts. Further, as I discuss below, the magnitude and breadth of the Majority's remedy is inconsistent with the restraints imposed by federal law.

---

[1] The Majority does not say whether any Court-created map remains in effect just through the 2018 elections, also through 2020, and any special elections that may arise in between, until after the 2020 census, or some other point in time.

The Elections Clause of the Federal Constitution states that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State *by the Legislature thereof*; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators."[2] U.S. CONST. art I, § 4, cl. 1 (emphasis added). The Elections Clause at its core, grants the authority to draw a state's congressional districts to the state legislatures, Congress, or an independent redistricting commission.[3] *Ariz. State Legislature v. Ariz. Indep. Redist. Comm'n*, 135 S. Ct. 2652, 2667-68 (2015). As the Supreme Court of the United States recognized, "redistricting is a legislative function, to be performed in accordance with

---

[2] The Supreme Court has described the Elections Clause as broad in scope, but has also noted it is a specific grant of power to the States directly. *Cook v. Gralike*, 531 U.S. 510, 523 (2001). The power of the States to regulate federal elections does not arise as a power "reserved" to the States under the Tenth Amendment. *Id.*; *see also, e.g.*, U.S. CONST. amend. X. In other words, "the States may regulate the incidents of such elections . . . only within the exclusive delegation of power under the Elections Clause." *Cook*, 531 U.S. at 523.

In discussing "state rights" and "federalism," the Majority appears to operate on the assumption that a state legislature's redistricting authority over federal elections is indeed such a Tenth Amendment power. Majority Op. at 137 n.79. However, other than the Elections Clause, "[n]o other constitutional provision gives the States authority over congressional elections, and no such authority could be reserved under the Tenth Amendment." *Cook*, 531 U.S. at 522-23. The Elections Clause is both an express grant of, and a limitation on, the power of state governments in federal elections, including the judiciary, and as I discuss *infra*, the cases cited by the Majority are not "concrete" and do not form "a bedrock foundation." Majority Op. at 134, 137. This is not reading the Elections Clause "in a vacuum." *Id.* at 137 n.79.

[3] The Majority misconstrues my view of the Elections Clause. *See* Majority Op. at 137 n.79. If this Court concluded that a congressional map was unconstitutional, *and* if the General Assembly was given sufficient time to act (which is not the case here) and it fails to act, a circumstance may arise where this Court could draw a map on a temporary remedial basis pending further state or federal legislative action. But it is quite another matter for this Court to put the General Assembly on a three-week timeline without articulating the complete criteria necessary to be constitutionally compliant.

the State's prescriptions for lawmaking, which may include the referendum and the Governor's veto." *Id.* at 2668. It is a truism that this Court possesses neither legislative function, nor authority. While this Court is certainly the final arbiter of the meaning of the Pennsylvania Constitution, it may not remedy any violations of our state charter, *in a manner*, that the Federal Constitution prohibits. After all, federal law is supreme. U.S. CONST. art. VI, cl. 2.

The Majority points to certain cases that in its view "make concrete the state judiciary's ability to formulate a redistricting plan, when necessary." Majority Op. at 134. At the outset, on this point, we can set aside *Butcher v. Bloom*, 216 A.2d 457 (Pa. 1966), which pertains to the state legislative districts of the General Assembly. *Butcher*, 216 A.2d at 457-58. The Elections Clause does not itself circumscribe this Court's authority in drawing a state legislative map, as the Elections Clause only refers to "[t]he Times, Places and Manner of holding Elections for Senators and Representatives[.]" U.S. CONST. art I, § 4, cl. 1; *see also Clingman v. Beaver*, 544 U.S. 581, 586 (2005) (stating, that the power granted to the States under the Elections Clause "is matched by state control over the election process for state offices.").

Turning to the cases of the Supreme Court of the United States cited by the Majority, none of them support the remedy contemplated here. In *Scott v. Germano*, 381 U.S. 407 (1965), the Supreme Court issued an unsigned per curiam opinion pertaining to apportionment among the Illinois Senate and the Illinois House of Representatives, which is outside the purview of the Elections Clause.[4] *Scott*, 381 U.S. at 408.

---

[4] Indeed, the cases cited in *Scott* as examples of state judicial intervention only pertain to state legislative districts. *See Scott*, 381 U.S. at 409 (collecting cases).

Nor did the Court contemplate the Elections Clause in *Growe v. Emison*, 507 U.S. 25 (1993).  In *Growe*, the Court, in an opinion authored by Justice Scalia, only considered the question of *Pullman* abstention.[5]  Briefly, there was dueling federal and state litigation about Minnesota's state and federal legislative districts.  *Growe*, 507 U.S. at 27-28.  The Court held the federal district court should have deferred any judicial intervention until the Minnesota courts had fully resolved its case.  The Elections Clause was not an issue in *Growe*, the Court merely observed what the Minnesota judiciary had done, and it did not hold it to be constitutionally valid.[6]  The Court's opinion in *Growe* sheds no light on whether a state court may take on the task of drawing a federal congressional map in the first instance.[7]

The Court points out that in *Wise v. Lipscomb*, 437 U.S. 535 (1978), the Supreme Court stated, "[l]egislative bodies should not leave their reapportionment tasks to the federal courts; but when those with legislative responsibilities do not respond, or the imminence of a state election makes it impractical for them to do so, it becomes the 'unwelcome obligation,' . . . of the federal court to devise and impose a reapportionment

---

[5] Generally, under *Pullman* abstention, named for *R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496 (1941), a federal court is required to defer to pending state court litigation "when a constitutional issue in the federal action will be mooted or presented in a different posture following conclusion of the state-court case."  *Growe*, 507 U.S. at 32.

[6] Indeed, the Court explicitly stated that after the Supreme Court of Minnesota adopted its own redistricting plan, the federal district court would then be permitted to resolve any and all claims regarding the state court's plan.  *Growe*, 507 U.S. at 36.

[7] Eleven years later, Justice Scalia dissented from the Court denying certiorari in *Colo. Gen. Assembly v. Salazar*, 541 U.S. 1903 (2004), which presented this very question of whether the Elections Clause permits congressional maps drawn by state courts.  While I recognize such dissents are of limited value, my point is only that it would seem odd for Justice Scalia to affirmatively wish for the Court to decide a constitutional question that he himself had supposedly just decided 11 years prior.

plan pending later legislative action." *Wise*, 437 U.S. at 540; *see also* Majority Op. at 134. The Majority's reliance on this sentence is misplaced for two reasons. First, like the other cases, *Wise* pertained to a Texas local districting scheme for the Dallas City Council, which is outside the Elections Clause's sphere of concern. *Id.* at 537-38; *see also* U.S. CONST. art I, § 4, cl. 1.

More importantly, *Wise* arose out of a federal court action.[8] As noted above, by its very text, the Elections Clause leaves the task of apportionment to state legislatures. However, the Clause also explicitly contemplates that *Congress* may override state legislatures as it wishes in this area. *See Ariz. State Legislature*, 135 S. Ct. at 2670 (stating, "[t]here can be no dispute that Congress itself may draw a State's congressional-district boundaries."); *accord Vieth v. Jubelirer*, 541 U.S. 267, 275 (2004) (plurality). Of course, that same Congress is empowered to shape the jurisdiction of the federal judiciary, with certain exceptions not relevant here. *See generally* U.S. CONST. art. III, § 1. It is therefore unsurprising that Congress may empower the federal judiciary to entertain civil suits and grant relief in a manner that overrides the maps drawn by state legislatures, where Congress may do the same directly through legislation. Indeed, the Court has expressly observed the Voting Rights Act of 1965 contemplates such relief. *See Branch v. Smith*, 538 U.S. 254, 268 (2003).[9]

---

[8] In *Agre v. Wolf*, ___ F. Supp. 3d ___, 2018 WL 351603 (E.D. Pa. Jan. 10, 2018), a federal court action was filed in the Eastern District of Pennsylvania, challenging the same congressional map that is before us in this case. On January 10, 2018, a three-judge district court entered judgment in favor of the state legislative and executive named defendants. There is an appeal currently pending.

[9] *Branch*, also authored by Justice Scalia, dealt with a federal court-authored congressional map for Mississippi's districts following the 2000 census. The Court observed that Congress enacted 2 U.S.C. § 2c to require single-member congressional districts, the boundaries of which "shall be established by law." 2 U.S.C. § 2c. *Branch* observed that this express congressional authorization, also authorized state and federal courts to enforce its mandate. *Branch*, 538 U.S. at 272. Interestingly, *Branch* (continued…)

For the foregoing reasons, I respectfully dissent.

---

(…continued)

also declined to address the district court's separate conclusion that a state-court-drawn map was unconstitutional under the Elections Clause. *Id.* at 265. In any event, there is no alleged violation of Section 2c in this case, nor is there any other congressional statute addressing partisan considerations in congressional districting.